Manu-Mine Research and Development Company v. Commissioner.
Manu-Mine Research & Development Co. v. Commissioner
Docket No. 2732-62.
United States Tax Court
T.C. Memo 1967-244; 1967 Tax Ct. Memo LEXIS 18; 26 T.C.M. (CCH) 1259; T.C.M. (RIA) 67244; December 7, 1967
*18 1. Respondent has failed to prove fraud for the taxable years here involved. 2. Reasonable compensation of three officers of petitioner determined from the evidence. 3. Two officers of petitioner (husband and wife) and their four children and a governess took an 8 or 9-day trip to Hawaii in the taxable year ended October 31, 1955, at a cost of approximately $8,000. Petitioner had a branch office in Hawaii. Held, $3,000 of the cost of the trip represented a business expense of the petitioner. 4. Compensation paid for services actually rendered by two persons during 3 months of the taxable year ended October 31, 1955, held, deductible by petitioner under section 162, I.R.C. 1954. 5. Depreciation of certain recreational facilities used in petitioner's trade or business determined from the evidence. 6. Under Issue 8 the respondent disallowed deductions claimed by petitioner for the fiscal year ended October 31, 1957, for certain business expenses totaling $101,223.78. In his briefs respondent conceded error as to $35,804.80. As to the balance of $65,418.98, it is held respondent erred as to $50,040.22 and is sustained as to $15,378.76 on the ground that petitioner claimed $15,378.76 *19 more than it actually paid to one Henry P. Cole for services he rendered. 7. Respondent determined that $1,200 paid by petitioner for domestic help during the taxable year ended October 31, 1956, represented personal, living and family expenses of the Stickler family, and not deductible by petitioner. Held, respondent's determination is sustained for insufficient proof. 8. Loss on sale of boat determined. 9. Deduction for miscellaneous expense determined. 10. Net operating loss carrybacks determined. Daniel Mungall, Jr., and Frederick G. McGavin, 217 N. 6th St., Reading, Pa., for the petitioner. Stephen P. Cadden, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax and additions to tax under section 6653(b), I.R.C. 1954, for the taxable years ended October 31, 1955, and October 31, 1956, in amounts as follows: Taxable Year
Addition to Tax
Ended
Deficiency
Sec. 6653(b)
10-31-1955
$113,352.79
$ 56,676.40
10-31-1956
772,082.79
386,041.40
Petitioner alleges that instead of the deficiencies determined by the respondent there are overpayments for the taxable years ended October 31, 1955, and October 31, 1956, in the *20 amounts of $1,104,221.84 and $130,201.19, respectively. These alleged overpayments are due primarily to petitioner's assignments of error 4(f) and 4(n) wherein petitioner alleges that respondent failed to take into consideration claims for refund for both years wherein petitioner claimed it was entitled to deductions in its taxable years ended October 31, 1955, and October 31, 1956, under section 172, Part VI, I.R.C. 1954, for net operating loss carrybacks from fiscal years ended October 31, 1957, October 31, 1958, and October 31, 1959, in the amounts of $1,902,577.29, [1] $308,816.03 and $174,362.38, respectively. The respondent in his brief concedes that petitioner is entitled to deductions in its taxable years for net operating loss carrybacks from the three subsequent years of "at least" the respective amounts of $1,794,908.79, $261,757.72, and $202,266.41. In determining the deficiencies the respondent made five adjustments to petitioner's net income reported on its return for the taxable year ended October 31, 1955, and six adjustments to the net income reported on petitioner's return for the taxable *21 year ended October 31, 1956. Petitioner has assigned as error all of these adjustments. Respondent has also made adjustments to the net operating loss carrybacks from the fiscal years ending October 31, 1957, 1958, and 1959, some of which he has conceded and some of which are in dispute, as more particularly appears hereafter. As a result of the assignments of error by petitioner and respondent's adjustments regarding the carrybacks, the issues to be considered (some of which may overlap others) are as follows: 1. Did petitioner take unallowable deductions for purchases of materials of $146,484.18 for the taxable year ended October 31, 1955, and $231,041.91 for the taxable year ended October 31, 1956, as determined? (Both parties have made concessions as to this issue. Respondent concedes that the $231,041.91 should be reduced by $65,000 returned to petitioner by its vice president, Richard H. Evans, a few weeks prior to Evans' automobile accident on January 9, 1956, as a result of which accident Evans died during January 1956, $40,000 returned to petitioner while Evans was in the hospital, and $100,000 returned to petitioner by Evans' daughter who was executrix of his estate. Petitioner *22 concedes that, due to Evans' death, it is unable to prove error as to the $146,484.18 item, or the remaining $26,041.91 of the $231,041.91 item. Although the tax consequences of Issue 1 are thus conceded, the issue remains important in its relation to Issue 2.) 2. Should fraud penalties be asserted for taxable years ended October 31, 1955, and October 31, 1956, as determined? 3. Were claimed deductions for compensation of officers excessive, as determined, i.e.: Taxable
Amount
Amount
Amount
Year Ended
Deducted
Allowed
Disallowed
Oct. 31, 1955
$101,500
$37,500
$ 64,000
Oct. 31, 1956
137,850
30,500
107,350
Oct. 31, 1957
31,120
27,500
3,620 4. Did respondent err in determining that petitioner's taxable income for the taxable year ended October 31, 1956, was understated in the amount of $1,125,053.10, due to certain contracts with the Pennsylvania Turnpike Commission? (In his brief respondent now concedes error as to this issue.) 5. Should claimed travel expenses of a trip to Hawaii of petitioner's president, his wife, four children and a governess be disallowed to the extent of $5,189.07 for the taxable year ended October 31, 1955, as being personal, as determined? 6. Should claimed sales and entertainment *23 expenses for the taxable year ended October 31, 1955, be disallowed to the extent of $1,920 as being nonbusiness items paid to Constance Dalpra and Elizabeth Dalpra, relatives of petitioner's president, as determined? 7. Should claimed depreciation be disallowed, as determined on recreational facilities not used for business purposes, i.e.: Taxable Year
Amount
Ended
Disallowed
October 31, 1955
$ 392.89
October 31, 1956
7,829.59
October 31, 1957
12,055.89
October 31, 1958
7,333.53
October 31, 1959
1,754.60
8. Should claimed litigation costs be disallowed, as determined, i.e.: Taxable Year
Amount
Ended
Disallowed
October 31, 1956
$ 12,300.00
October 31, 1957
101,223.78 (Respondent now concedes that the entire amount of $12,300 and $35,804.80 of the $101,223.78 should be allowed.) 9. Should salaries charged to operations be disallowed for taxable year ended October 31, 1956, to extent of $1,200, as determined, as being estimated value of domestic help rendered to Charles W. Stickler, Jr., petitioner's president, as determined? 10. Did petitioner take an unallowable deduction for taxable year ended October 31, 1958, for loss on sales of recreational facilities in amount of $4,369.84, as determined? 11. Did *24 petitioner take an unallowable deduction for the taxable year ended October 31, 1958, for general administrative and miscellaneous expense to the extent of $3,782, as determined? 12. Did petitioner take an unallowable deduction for the taxable year ended October 31, 1959, for unsubstantiated bad debts to the extent of $33,840.73, as determined? (Respondent now concedes this issue except to the extent of $54.23, which latter amount petitioner in turn concedes.) 13. Was petitioner entitled to deductions in the taxable years ended October 31, 1955, and October 31, 1956, for net operating loss carrybacks from fiscal years ended October 31, 1957, October 31, 1958, and October 31, 1959, in excess of the previously stated amounts now conceded by respondent? In addition to the above-mentioned 13 issues, the respondent made certain other adjustments, pro and con, to the net operating losses claimed for the fiscal years ended October 31, 1958, and October 31, 1959, which have been settled by stipulation and are no longer in dispute. Effect thereto will be given under Rule 50. Briefly they are: Oct. 31, 1958
Oct. 31, 1959
1. Additional deduction
allowable
($ 79.26)
2. Interest expense un-
allowable
$38,732.42
3. Interest expense al-
lowable
( 10,853.81)
4. Additional interest in-
come
6,135.48
1,258.68
5. Additional gain on
sale of land
1,705.04
6. Bond premium ex-
pense allowable
(15,000.00)
7. Additional taxes al-
lowable
( 20,038.47)
Net totals
$31,572.94
($29,712.86)
Findings *25 of Fact The parties have filed a stipulation of facts, in seven parts, which, together with the exhibits attached thereto, is incorporated herein by reference. General Findings Petitioner, sometimes referred to herein as "Manu-Mine," is a corporation organized under the laws of the Commonwealth of Pennsylvania on March 9, 1951, with its principal office located in Reading, Berks County, Pa., on the date when the petition in this proceeding was filed. Petitioner maintained its books of account and filed its corporation income tax returns on the accrual basis for fiscal years ended October 31. The returns for the fiscal years ended October 31, 1955, and October 31, 1956, were filed with the district director of internal revenue at Philadelphia, Pa. Petitioner succeeded to a business previously conducted by Charles W. Stickler, Jr., and Nellie M. L. Stickler, his wife, as partners under the name of Manu-Mine Products Company. The business was originated to make marketable many of the ideas for services and products on which Stickler had previously worked as a mining and consulting engineer. Petitioner's major emphasis at the outset involved soil solidification, a process of cementing *26 together particles of soil by solidifying agents in order to provide support for surface weight, to prevent erosion and to prevent water seepage. This activity was an important factor in petitioner's operations through the years in question. The corporate officers of petitioner during the taxable years ended October 31, 1955, and October 31, 1956, were as follows: Office
Officer
Remarks
President
Charles W. Stickler, Jr.
0
Vice President
Richard H. Evans
Died
1-18-56
Vice President
F. G. McGavin
From
1-19-56
Executive Vice President
C. A. Landsidle
From
1-19-56
Vice President in charge of contracts and sales
Paul J. McNeill
From
6-11-56
Secretary
F. G. McGavin
To
6-27-55
Secretary
Nellie M. L. Stickler
From
6-27-55
Asst. Secretary
Nellie M. L. Stickler
To
6-27-55
Asst. Secretary
F. G. McGavin
From
10-16-56
Treasurer
F. G. McGavin
To
4-27-55
Treasurer
Nellie M. L. Stickler
From
4-27-55
Asst. Treasurer
Nellie M. L. Stickler
To
4-27-55
Asst. Treasurer
F. G. McGavin
From
4-27-55
to
6-27-55
The directors of petitioners during these same years were as follows: Name of Director
Remarks
Charles W. Stickler, Jr.
0
Richard H. Evans
To 1-18-56
Nellie M. L. Stickler
From 1-28-55
F. G. McGavin
To 6-27-55
F. G. McGavin
From 1-19-56
The shareholders of petitioner, *27 together with the number of shares held during these same years, were as follows: From
3/9/51
5/27/55
to
to
After
Shareholder
5/27/55
10/25/55
10/25/55
Charles W. Stickler, Jr.
14
13
247
Richard H. Evans
3
3
57 *
Nellie M. L. Stickler
8
7
133
Guy Dalpra
0
2
38
Richard H. Evans was the son of Thomas J. Evans who was a Commissioner of the Pennsylvania Turnpike Commission. On February 28, 1955, Thomas was chairman of the Commission. Richard died on January 18, 1956, following an automobile accident about 9 days earlier. Charles W. Stickler, Jr., hereinafter sometimes referred to as Stickler, was a nephew of the wife of Thomas J. Evans. Stickler and Nellie M. L. Stickler were married in 1941. They have four children. Some time prior to the taxable years here in question they purchased a 39-acre piece of property in a country area about 7 miles from Reading, Pa. They thought that it was best for petitioner's business to have a place in the country where business prospects could come and talk over technical problems in a free atmosphere, free of dust, and traffic difficulties. The area was called Angelica. On the property was a 10-bedroom, 6-bathroom *28 home, a swimming pool, a gardener's facility, a workshop, and a 4-car garage, with apartment facilities over the garage. Petitioner used the apartment above the garage for a general office, and the basement of the garage for laboratory work as well as a stockroom. Early in 1955 Stickler built a laboratory building on the property for use as office quarters, drafting area, laboratory and a machine shop. He rented the building to petitioner until the latter purchased it from Stickler some time during September 1955. Adjacent to Angelica was another large residential house with a swimming pool which petitioner acquired about this same time. In the basement of this house petitioner established an extensive photographic laboratory. This house was called the clubhouse. Angelica became a showplace where people having business with petitioner enjoyed visiting. In addition to using it as a home, it was used frequently to entertain petitioner's business visitors overnight and to serve noon lunches to petitioner's employees. Petitioner operated under 12 main divisions, namely, civil engineering, soil solidification, geology, mining engineering, mechanical engineering, nuclear energy, construction, *29 project, ceramics, photographic, sales, and office administration. Petitioner had branch offices located at Bedford, Pa.; Phoenix, Ariz.; Miami, Fla.; and Honolulu, T.H. During the taxable year ended October 31, 1955, petitioner was engaged in attempting to prevent leakage in tunnels for the Pennsylvania Turnpike Commission under a contract dated May 25, 1953. Prior to February 28, 1955, petitioner had made a study of the proposed route of the Northeastern Extension of the Turnpike and had made certain recommendations to the Commission as to how to take care of the matter of supporting the surface of the roadway over the area where the right-of-way would pass over certain mined-out coal fields. On February 28, 1955, petitioner and the Commission entered into a contract under which petitioner was thereafter engaged in drilling about 6,000 holes lined with steel pipe so that other contractors could fill the holes with sand and silt for the purpose of filing the voids in the coal mines beneath the proposed right-of-way. The said contracts with the Pennsylvania Turnpike Commission relating to soil solidification on the tunnels, the exploratory work which began in 1954, and the contract *30 of February 28, 1955, were responsible for a substantial portion of petitioner's gross income in the years 1953 through 1956. On its returns for the taxable years ended October 31, 1955, and 1956 petitioner reported gross sales of $5,238,550.63 and $4,574,893.51, respectively. During the taxable year ended October 31, 1955, the number of employees on petitioner's payroll grew from about 50 to 75 at the beginning of the year to about 350 to 400 at the end of the year. On June 6, 1956, Herbert B. Cohen, the then Attorney General of the Commonwealth of Pennsylvania, filed in the Court of Quarter Sessions, County of Dauphin, a petition for grand jury investigation. In this petition Cohen, among other things, represented: 1. That he, as Attorney General, by himself, his deputies, subordinates, and officers of the Pennsylvania State Police, has conducted and is conducting a diligent search, inquiry and investigation of the Pennsylvania Turnpike Commission, its affairs, officers and employees * * *, and for a more complete, proper and necessary enforcement of the criminal laws of the Commonwealth he is in need of the assistance to be derived from a Grand Jury Investigation. 2. That as a result *31 of his investigation as aforesaid, your Petitioner has in his possession competent and credible evidence showing that in the year 1955 and in years prior thereto * * * Thomas J. Evans, Charles W. Stickler, Jr. Richard H. Evans, deceased, Manu-Mine Research and Development Company * * * together with divers other evilly disposed persons, did unlawfuly, fraudulently, falsely, wilfully and maliciously conspire, combine, confederate and agree, among and between themselves and other persons, to cheat and defraud the Pennsylvania Turnpike Commission, an instrumentality of the Commonwealth, of its monies and chattels of the aggregate value of nineteen million five hundred thousand dollars ($19,500,000.00) * * *. As a result of this petition, the regular indicting grand jury of Dauphin County returned four bills of indictment on January 25, 1957, naming therein as defendants Thomas J. Evans and James F. Torrance, both commissioners of the Commission; John D. Paul, assistant chief engineer of the Commission; Theodore S. Paul, chief of the legal bureau of the Commission; Stickler and Landsidle, president and general manager, respectively, of petitioner; McNeill, finance director of the Commission, *32 and G. J. Hudert and E. J. Donnely, both consulting engineers of J. E. Greiner Company. The four cases were consolidated for trial and after a trial which extended for approximately 7 weeks, five of the defendants were found guilty by the jury. Among those convicted were Stickler and Landsidle. Thereafter, sentences were imposed and the convictions as to Stickler and Landsidle and two other defendants, Evans and Torrance, were affirmed by the Superior Court of Pennsylvania, 190 Pa. Super. 179-310, 154 A. 2d 57-123, and in turn affirmed per curiam by the Supreme Court of Pennsylvania, 399 Pa. 387, 160 A. 2d 407-416. Issues 1 and 2 (Purchases and Fraud) In addition to his connection with Manu-Mine, Richard H. Evans, during 1955 and until the time of his death on January 18, 1956, was the president, a director and stockholder in two other corporations, namely, the D. and E. Sporting Goods Company, hereinafter sometimes referred to as D & E, and the B & W Trading Corporation, hereinafter sometimes referred to as B & W. Palmer M. Evans succeeded Richard H. Evans, to whom he was not related, as president of B & W, and Palmer was also treasurer, a director and stockholder in B & W in 1955 *33 and 1956. During 1955 and 1956 John Danchak was treasurer, a director and stockholder in D & E. Alleged purchase items claimed as deductible by Manu-Mine for the taxable year ended October 31, 1955, were overstated for income tax purposes as to D & E by Manu-Mine to the extent of $69,534.25, and as to B & W by Manu-Mine to the extent of $76,949.93, as determined in the statutory notices of deficiencies. The total of these two alleged purchase items is $146,484.18. Alleged purchase items claimed as deductible by Manu-Mine for the taxable year ended October 31, 1956, were overstated for income tax purposes as to D & E by Manu-Mine to the extent of $159,132.66, and as to B & W by Manu-Mine to the extent of $71,909.25 as determined in the statutory notices of deficiencies. The total of these two alleged purchase items is $231,041.91. During the taxable year ended October 31, 1956, cash in the total amount of $205,000 was returned to Manu-Mine and was credited to the above-mentioned alleged purchase items totaling $231,041.91. The $205,000 was made up of the following: (a) Received by Manu-Mine from Dan-
chak, treasurer of D & E
$ 40,000
(b) Received by Manu-Mine from Rich-
ard H. Evans prior to his death
on Jan. 18, 1956
65,000
(c) Received by Manu-Mine from Sarah
Jane Evans Brennan, executrix
and daughter of the aforesaid
Richard H. Evans, subsequent to
January 18, 1956, representing
cash not owned by the said Estate
of Richard H. Evans, Deceased,
but located in his safe deposit box
100,000
Total
$205,000
*34 The aforesaid amount of $146,484.18 is composed of petitioner's checks described as follows: Manu-
Date
Mine
Amount of
of Payment
Payee
Check No.
Check
July 6, 1955
B & W
4589
$ 7,727.56
July 27, 1955
B & W
4915
21,845.00
July 27, 1955
B & W
4916
24,971.15
Aug. 30, 1955
B & W
5216
20,390.22
Oct. 17, 1955
B & W
5874
6,310.00
Oct. 19, 1955
Less recorded sale
on B & W books.
No check issued
by Manu-Mine
(4,294.00)
Total net to
B & W
$ 76,949.93
Sept. 26, 1955
D & E *
5616
$ 24,720.00
Sept. 26, 1955
D & E
5617
15,174.25
Oct. 17, 1955
D & E
5873
29,640.00
Total net to
D & E
$ 69,534.25
Total, as aforesaid
$146,484.18 The aforesaid amount of $231,041.91 is composed of petitioner's checks described as follows: Manu-
Date
Mine
Amount of
of Payment
Payee
Check No.
Check
Nov. 2, 1955
B & W
6058
$ 9,530.00
Nov. 4, 1955
Recorded sale on
B & W books.
No check issued
(4,159.50)
Nov. 25, 1955
B & W
6400
38,569.75
Dec. 23, 1955
B & W
6779
27,969.00
Total net to
B & W
$ 71,909.25
Nov. 10, 1955
D & E
6166
$ 19,860.00
Nov. 21, 1955
D & E
6379
7,743.50
Nov. 30, 1955
D & E
6494
18,854.50
Dec. 16, 1955
D & E
6697
11,925.93
Dec. 16, 1955
D & E
6698
5,471.23
Dec. 28, 1955
D & E
6858
20,507.50
Dec. 28, 1955
D & E
6859
24,317.50
Jan. 2, 1956
D & E
6878
11,700.00
Jan. 6, 1956
D & E
6911
18,872.50
Jan. 16, 1956
D & E
7034
19,880.00
Total net to
D & E
$159,132.66
Total, as aforesaid
$231,041.91
*35 Prior to the death of Richard H. Evans all the capital stock of B & W was owned 50 percent by Richard and 50 percent by Palmer M. Evans. Richard devoted very little of his time to the affairs of B & W. B & W did a regular trading business. Among the items it sold was calcium chloride, oil suits, safety equipment, mine supplies and calcium, which was the big product that it sold. D & E was organized as a corporation about February 1947. The initials stand for Danchak & Evans. Richard H. Evans, although the president, a director and stockholder of D & E, devoted very little of his time to the affairs of that corporation. Danchak did approximately 99 percent of the work. After Richard's death, his wife Isabelle became president. The business of D & E was strictly sporting goods of all types. It covered that entire field, both wholesale and retail. Shortly after petitioner entered into the contract dated February 28, 1955, with the Pennsylvania Turnpike Commission a steel strike was threatened. This was a matter of serious concern to petitioner which required a very large quantity of pipe for casing approximately 6,000 to 7,000 drill holes averaging 150 to 200 feet deep under that contract. *36 The order for pipe, which petitioner gave to its local supplier, was much larger than it had ever handled before. Further, petitioner was faced with the task of completing the drilling and casing work in a short period of time. Under the circumstances, petitioner decided that it would be prudent to purchase pipe from whatever sources might be available, including coal operators, second-hand dealers, and the like. It was expected that such strenuous efforts on the part of petitioner to acquire pipe directly would result in increases in the price of pipe. In some instances it was recognized that purchases could be made only on a cash basis. It was considered desirable, in order to prevent prices from going up unnecessarily, to make these purchases anonymously and in the name of someone other than petitioner. Richard H. Evans was given and assumed the entire responsibility for purchasing as much pipe as possible, new or used, and from whatever sources he could obtain the same, if necessary for cash, and preferably through one of his other companies so that the fact that petitioner was involved in the purchases would not become public knowledge. While Richard H. Evans had promised to supply *37 Stickler with a record of the results of his work in this regard, his unexpected death in January 1956 prevented his providing that explanation. However, adequate quantities of pipe were received on the job and at no time was the work held up for lack of pipe. In order that the purchases of pipe by Richard H. Evans on behalf of petitioner would not become public knowledge, Evans and Stickler, who were first cousins, decided that the purchases should be handled through B & W and D & E. They recognized that Evans would need cash in some instances and decided that, to provide a proper basis for accounting and for the advance of cash to be used for this purpose, those two companies should issue invoices from time to time to petitioner. Between June 3, 1955, and June 30, 1955, Richard H. Evans caused B & W to issue 8 invoices to petitioner totaling $7,727.56, which invoices did not represent existing sales by B & W to petitioner. On July 6, 1955, petitioner issued its check No. 4589 in payment of these invoices. Upon receipt of the check, Palmer M. Evans cashed the check at the bank and turned the cash over to Richard. This same procedure was followed with respect to checks numbered 4915, *38 4916, 5216, 5874, 6058, 6400, and 6779. Between September 2, 1955, and September 16, 1955, Richard H. Evans caused D & E to issue 5 invoices to petitioner, totaling $24,720, which invoices did not represent existing sales by D & E to petitioner. On September 26, 1955, petitioner issued its check No. 5616 in payment of these invoices. Upon receipt of the check, Danchak cashed the check at the bank and turned the cash over to Richard. This same procedure was followed with respect to checks numbered 5617, 5873, 6166, 6379, 6494, 6697, 6698, 6858, 6859, and 6878. Danchak also cashed checks numbered 6911 and 7034, but turned the cash over to Stickler as Richard H. Evans was then in the hospital, following his automobile accident, and Danchak wanted to be relived of his responsibility for that amount of money. [2]
Danchak first objected to this procedure but Richard H. Evans assured Danchak there was nothing wrong in what was being done as it was simply in effect a method whereby Evans would receive cash from Manu-Mine by way of *39 a conduit with which to buy pipe and other scarce material for Manu-Mine. Richard H. Evans gave no explanation to Palmer M. Evans as to why this procedure was followed. Palmer never asked for an explanation. Richard did tell Palmer that the transactions should not be reflected on the books of B & W, and that they were to be kept confidential and no one was to know about them. Palmer considered the transactions as being between Richard and petitioner. Upon receipt of these invoices from B & W and D & E, petitioner issued its checks in payment thereof. In this manner, petitioner paid out and charged to purchases the following amounts in the taxable years indicated: Taxable Year 10-31-55
Taxable Year 10-31-56
No. of
No. of
Payee
Invoices
Amount
Invoices
Amount
B & W
21
$ 76,949.93
16
$ 71,909.25
D & E
12
69,534.25
28
159,132.66
$146,484.18
$231,041.91
In accordance with Richard H. Evans' instructions to Palmer M. Evans and Danchak, neither B & W nor D & E recorded the invoices or the checks from petitioner in payment thereof in their accounting records. Each considered that the transactions were primarily between Richard H. Evans and petitioner. During the taxable years here involved petitioner made some *40 small purchases from B & W and D & E of merchandise sold by those companies, which purchases were duly recorded on the books of B & W and D & E, respectively, and are not involved in this proceeding. The $205,000 that was returned to petitioner in the taxable year ended October 31, 1956, was first put in Stickler's safe deposit box because petitioner's cash position was good and Stickler felt that the money would still be needed to purchase pipe. When the difficulties with the Pennsylvania Turnpike Commission began in March and April 1956 Stickler was concerned with the possibility of a court battle and an injunction. Further, he wanted advice from petitioner's accountant as to how the money should be returned. Stickler advised the accountant of the transactions at the end of the taxable year ending October 31, 1956, and the accountant prepared a journal entry which debited accounts receivable from the Evans Estate and Stickler in the amount of $205,000 and credited purchases for the year so as to reduce the cost of sales by that amount. Thereafter, the $205,000 was returned to petitioner. Richard H. Evans had advised Stickler that he would supply a record of the pipe purchasers in *41 the manner previously described. His unexpected and accidental death occurred before he did so. Because of the phenomenal growth of petitioner, and because of the physical nature of the area in which the work of the Northeastern Extension of the Turnpike was being performed, petitioner had found it impossible to establish an adequate inventory control system and was unable to determine from its own records whether or not the balance of the money received by Richard ($172,526.09) had been used for the purchase of pipe. Thereafter, petitioner made every effort to determine in the field whether or not pipe had been purchased with that money. Because (a) the area in which the work had been done was isolated and difficult of access, (b) some of the pipe had been stolen, and (c) pipe in place had been buried in the course of hurricane Hazel, the quantity of which could not be measured, petitioner was unable to reconstruct an inventory after the event to indicate that pipe in that quantity had been purchased. [3] *42 Reading Heater & Supply Co., Inc., supplied petitioner with pipe from April 1955 through December 1955. The orders which petitioner placed with Reading were so large that petitioner was required to provide Reading with cash in advance. In October 1955 petitioner paid Reading $187,036.53, $85,912.94 of which was for invoices which that company had not yet rendered and which resulted in a substantial credit belance in petitioner's favor. On December 30, 1955, petitioner paid Reading $83,126.68 against two Reading memorandum billings of that company which were in advance of any delivery and which that company did not reflect in its accounts receivable ledger. As a result of these and other transactions, petitioner had overpaid Reading by $29,760.70 by January 4, 1956. These transactions between petitioner and Reading took place in the ordinary course of petitioner's business and pursuant to its urgent need to require pipe for the performance of its contract with the Pennsylvania Turnpike Commission *43 dated February 28, 1955. The advance of money to Richard H. Evans by petitioner through B & W and D & E during the taxable years ended October 31, 1955, and October 31, 1956, for the purchase of pipe and other material, and the return of a portion of that money to petitioner in the taxable year ended October 31, 1956, did not result in any underpayment of tax by petitioner during those years due to fraud. Issue 3 (Compensation of Officers) Our general findings and our findings under Issues 1 and 2 are incorporated under this issue and other issues to the extent applicable. For petitioner's taxable years ended October 31, 1955, and October 31, 1956, and for the fiscal year ended October 31, 1957, the respondent allowed and disallowed compensation of corporate officers claimed by petitioner as follows: Year
Claimed
Allowed
Disallowed
1955
$101,500
$37,500
$ 64,000
1956
137,850
30,500
107,350
1957
31,120
27,500
3,620
Totals
$270,470
$95,500
$174,970
The amounts claimed for each officer as to the various years are as follows: Taxable Year Ended October 31, 1955
Dis-
Officer
Claimed
Allowed
allowed
Charles W.
Stickler, Jr.
$ 61,400
$25,000
$36,400
Richard H. Evans
28,500
10,000
18,500
Nellie M. L.
Stickler
11,600
2,500
9,100
Totals
$101,500
$37,500
$64,000
Taxable Year Ended October 31, 1956
Charles W.
Stickler, Jr.
$109,750
$25,000
$ 84,750
Richard H. Evans
3,000
3,000
None
Nellie M. L.
Stickler
25,100
2,500
22,600
Totals
$137,850
$30,500
$107,350
Fiscal Year Ended October 31, 1957
Charles W.
Stickler, Jr.
$25,000
$25,000
None
Nellie M. L.
Stickler
6,120
2,500
$3,620
Totals
$31,120
$27,500
$3,620
*44 The deductions for compensation of the above officers claimed by petitioner on its corporate income tax returns for the fiscal years ended October 31, 1952, October 31, 1953, and October 31, 1954, and allowed by respondent, were as follows: Officer
1952
1953
1954
Charles W.
Stickler, Jr.
$9,250
$41,000
$45,000
Richard H. Evans.
6,150
17,500
21,000
Nellie M. L.
Stickler
1,000
300
1,800
Petitioner's gross income for each of its fiscal years ended October 31, 1951, through October 31, 1956, was as follows: 1951
$ 32,980.55
1952
116,376.05
1953
310,793.52
1954
815,890.93
1955
5,238,550.63 *
1956
4,574,893.51 *
The above amount of gross sales for 1956 did not include the $1,125,053.10 claimed from the Pennsylvania Turnpike Commission, which amount the officers of petitioner believed to be due. Within 60 to 90 days after petitioner entered into the contract with the Pennsylvania Turnpike Commission, dated February 28, 1955, the number of its employees grew from about 50 to 75 to about 350 to 400. Upon the termination of that contract during the taxable year ended October 31, 1956, petitioner was awarded substantial contracts with the United States Navy, as a result of which its number of employees *45 remained at approximately 350 to 400 at October 31, 1956. The policies of petitioner were formulated by Stickler, his wife Nellie, Richard H. Evans, hereinafter in this issue referred to as Evans, and F. G. McGavin. Stickler held a degree of bachelor of science in mining engineering from Pennsylvania State College which he received in 1937. Upon graduation he worked from time to time in the coal industry, with engineering firms, and as an engineering consultant. Further, he was an associate professor of mining on a part-time basis at Pennsylvania State College. Shortly after leaving Pennsylvania State College and in 1950 he formed the business partnership with his wife. This business was transferred to the petitioner at the time of its formation in March 1951. The contract between the Pennsylvania Turnpike Commission and petitioner, dated May 25, 1953, relating to the soil solidification work on the tunnels resulted from the study and research which Stickler did, and from the meetings which he had with representatives of the Pennsylvania Turnpike Commission. Thereafter, in July 1954, petitioner, through Stickler, was engaged by the Pennsylvania Turnpike Commission to do exploratory *46 work, including the drilling of test holes along the proposed right-of-way of the Northeast Extension, to determine whether actual conditions conformed with the conditions as reflected in the mining maps and to make recommendations as to how the surface should be supported in the areas where the route traversed the coal fields. As a result of the recommendations made by petitioner through Stickler pursuant to this exploratory work, petitioner was awarded the contract of February 28, 1955. Stickler was responsible for building up the organization of the company and hiring key personnel; he organized the laboratories of petitioner and its subsidiary; he sold the soil solidification services; and he worked up the general approach for publicity and advertising and the buildup of the public knowledge of the services the petitioner was able to perform. The advertising program stressed petitioner's activities in the field of geology and soil solidification. Petitioner's advertisements appeared in Fortune Magazine, the Wall Street Journal, and the New York Times. The program was expanded in early 1956 and as a result petitioner received over 8,000 inquiries from various places in the United *47 States and several hundred inquiries from foreign countries. During the fiscal years ended October 31, 1955, and October 31, 1956, Stickler spent virtually all of his time on the affairs of petitioner. The hours were long; weekends and holidays were spent on company business; he took no vacations as such; and the Sticklers had very little private social life, their entertaining being confined primarily to entertainment of business contacts. During the taxable years ended October 31, 1955, and October 31, 1956, the board of directors met monthly. There was virtually 100 percent attendance by the directors at these meetings and they spent anywhere from a half a day to a whole day on the affairs of petitioner. There were also informal meetings of the directors each week which extended from an hour or two to a full day. The directors were concerned with the type of work petitioner should engage in, the buildup of soil solidification, the advertising program, problems of manpower and materials, the policy of whether or not certain jobs should be taken, whether particular jobs could be handled, and the problems of financing. Two signatures were required on petitioner's checks. Stickler, *48 his wife, Evans, and the comptroller were the only persons with authority to sign such checks. Stickler approved invoices and signed the checks. During petitioner's taxable year ended October 31, 1956, Stickler was attracted to the possibility of drilling for oil in Kentucky. Against the advice of petitioner's geologist who was uncertain about the possibility of oil, Stickler caused petitioner to drill three holes, the third of which produced about 300 barrels of oil a day. This meant a return to petitioner of about $300,000 a year. While Stickler's wife, sometimes referred to as Nellie, had no business training and no business experience except as a secretary prior to her marriage in 1941 to Stickler, she did work with Stickler from the beginning of their marriage and took a substantial interest in his business activities. Following the transfer of the business of the partnership to petitioner in 1951, Nellie became an officer of petitioner and continued to work on the affairs of the business. As a partner in the partnership, she had helped in the formulation of products developed by the partnership and she was the only employee of petitioner, other than Stickler, who knew the soil *49 solidification formula and the manner of its application. She was sufficiently familiar with soil solidification to be able to supply, in the absence of Stickler, information to employees of petitioner regarding the application of chemicals to a particular job. From the formation of petitioner in 1951, she was a member of the policy making group and participated actively in the formulation of petitioner's policies. She traveled with Stickler on business trips once or twice a month, in the course of which he consulted with her on matters of policy. Her judgment on matters carried weight in the deliberation. She was opposed to petitioner's undertaking a project in South Carolina involving a quarter of a million dollars, a soil solidification project in Hawaii, and a project of soil solidification in connection with offshore drilling in the Gulf of Mexico and in each of these instances her view prevailed and petitioner did not undertake the projects. Nellie attended both the monthly formal and weekly informal meetings of the directors and participated actively in the deliberations. When Stickler was absent on business Nellie was the person to whom any business problems were referred. *50 In the case of minor policy questions and problems, she handled them herself. In the case of more major questions, she would consult with Evans and Stickler before acting. Nellie was responsible for furnishing and maintaining the main residential house and the clubhouse and for the landscaping and upkeep of the entire Angelica property. Nellie worked extensively with Stickler in the preparation of the advertising and publicity materials utilized by petitioner. She was one of four persons authorized to co-sign checks on behalf of petitioner and she was called upon to sign as many as 30 checks a week. While Nellie performed the usual duties of a housewife and mother of a growing family, she spent a great deal of each day, beginning early in the morning and extending into late evening hours, including weekends and holidays, in the performance of these duties for petitioner. She performed the equivalent of a full work week for the petitioner each week of the years here involved. Nellie had received little or no compensation for the performance of these duties in the earlier years of petitioner's activities. Her compensation in the taxable years 1955 and 1956 was increased over prior years *51 in partial recognition of the fact that she had received little or no compensation in the earlier years and because petitioner was in a better position to pay. While Nellie's duties in the fiscal year ending October 31, 1957, were reduced because of petitioner's difficulties with the Pennsylvania Turnpike Commission and the losses sustained on the contracts with the United States Navy, she did continue to perform similar services for petitioner in that year. During petitioner's fiscal year ended October 31, 1955, Evans regularly spent one or two days a week on petitioner's business at its offices in Angelica and the performance of his duties for petitioner required him to spend additional time on its affairs away from the Angelica property. Evans was faithful in attending the formal monthly meetings of the board of directors and also the informal weekly meetings, at which meetings the policies of petitioner were set and its affairs administered. Evans had considerable business experience and a wide circle of friends and acquaintances in the area of petitioner's operations and elsewhere. By reason of these contacts, he was able to facilitate petitioner's relationships with many business *52 people and concerns and was responsible for procuring business for petitioner. He had experience in insurance and bond matters and was able to arrange and was responsible for petitioner's insurance and bonding requirements. His financial and business experience was superior to that of the other members of the policy group and his advice on these matters was, therefore, particularly valuable to petitioner. Evans' knowledge of the contracting business as a result of his bonding experience enabled him to assist petitioner in locating necessary construction equipment. A reasonable allowance for salaries or other compensation for personal services actually rendered petitioner by Stickler, Evans, and Nellie in the years when respondent determined that the compensation paid these officers was excessive is as follows: Year
Year
Year
Ended
Ended
Ended
Oct. 31,
Oct. 31,
Oct. 31,
Officer
1955
1956
1957
Stickler
$61,400
$75,000
Evans
28,500
Nellie
11,600
12,000
$6,120
Issue 5 - (Trip to Hawaii) Petitioner claimed a deduction for ordinary and necessary business expense on its corporation income tax return for the taxable year ended October 31, 1955, for travel expense in the amount of $5,189.07. The said sum is charged *53 on petitioner's books as an expense of an 8 or 9-day trip to Hawaii in August 1955. Persons making the trip were Stickler, his wife, their four children and a sister-in-law. The respondent, in a statement attached to the deficiency notice, disallowed the claimed deduction on the ground that "The evidence submitted does not prove that the amounts claimed were actually expended for the purposes designated." In 1955 the Territory of Hawaii was in the process of building a tunnel for passage from Honolulu to the other side of the island. In the course of building this tunnel, a major disaster occurred. The contractors, in going through the mountain, ran into flowing loose sand or volcanic ash which killed six men. The tunnel was shut down. Petitioner's representative in Honolulu, where petitioner had a branch office, was consulted by the authorities in Hawaii with the hope that petitioner could take over the job of completing the tunnel. Stickler was asked to come to Hawaii to see what could be done. Stickler went to Hawaii for that purpose and took his wife with him to participate in the decision to be made. They took their four children with them, whose ages were between 3 and 11 years, *54 because they thought they might be away for several weeks. The Sticklers' domestic help at the residence had left and they were concerned about leaving the children who had never been separated from their parents before. The sister-in-law was taken along to take care of the children. While in Hawaii, Stickler devoted his entire time to this project, except for one day spent in sightseeing. While Nellie did not visit the site because of the hazardous conditions, Stickler kept her advised as to what transpired. It appeared that there was a substantial controversy as to who was responsible for the cave-in and who was going to pay for the additional costs. Faced with the possibility of bringing in engineers to make preliminary studies and the absence of assurance as to who was going to compensate petitioner, Stickler and his wife decided not to take a chance on the project. The entire cost of the trip was approximately $8,000. Stickler charged $5,189.07 of the entire cost to petitioner as ordinary and necessary business expenses and the balance was treated by Stickler as personal, living, or family expenses. Of the entire cost of the trip, $3,000 was an ordinary and necessary expense incurred *55 during the taxable year ended October 31, 1955, in carrying on petitioner's trade or business. Issue 6 - (Entertainment Expenses) Petitioner claimed a deduction for "sales and entertainment" expenses on its corporate income tax return for the taxable year ended October 31, 1955, in the amount of $1,920. This sum is represented by petitioner's checks to the order of Constance Dalpra and Elizabeth Dalpra. In a statement attached to the deficiency notice, respondent disallowed the claimed deduction on the ground that "The evidence submitted does not prove that the amounts claimed were actually expended for the purposes designated." Constance was Nellie's sister-in-law and Elizabeth was Nellie's sister. During August, September, and October 1955, Constance gathered together a report for petitioner covering the various water companies and water boards in Southwestern Ohio so that petitioner might pursue the application of its soil solidification program to reservoirs as it had done in Easton, Pa. Petitioner paid Constance $1,110 for the services she rendered. During these same months, Elizabeth performed the same kind of services for petitioner in Western Pennsylvania and in the Uniontown *56 area. Petitioner paid Elizabeth $820 for the services she rendered. These were fair and reasonable amounts [4] for the services rendered. Issue 7 (Depreciation) Year ended October 31, 1955: In its return for this year petitioner deducted $392.89 for depreciation of recreation facilities. In Schedule I of the return petitioner explained this deduction as follows: Kind of property:
Recreation Facilities
Date acquired:
1955
Cost or other basis:
$3,928.93
Depreciation
prior years:
None
Method:
Declining balance
Rate (%) or life:
5 years
Depreciation:
$392.89 (1/2 year)
Respondent disallowed the deduction and, in a statement attached to the deficiency notice, stated: The deduction of $392.89 claimed for depreciation on recreation facilities has been disallowed since the equipment was not used for business purposes. The claimed depreciation is based on items purchased during the taxable year ended October 31, 1955, at a cost of $3,928.93, as follows: Date of Purchase
Item
Cost
Aug. 1, 1955
Piano
$2,929.00
Aug. 19, 1955
15-foot boat
734.93
Aug. 31, 1955
Coke dispensing
machine
265.00
$3,928.93
The *57 piano was acquired to improve the appearance of the main living room of the main house where Stickler and his family resided. It was not used in petitioner's trade or business. The 15-foot boat was a small boat which petitioner used primarily to get out from the dock area to the first of two larger boats which were acquired in the following year, namely, a 35-foot boat which was traded for a 43-foot boat. The boats were acquired by petitioner in part with the idea of studying the soil erosion problems along the Chesapeake Bay, and in part for pleasure. The boats were equipped with detectors to give depth findings and were used to do a technical and important job along the coastline. On four occasions the boats were used by Stickler and his family for pleasure. The children and their mother all became seasick immediately and that precluded any further use of the boats by the Stickler family for pleasure. The boats, however, were also available to employees of petitioner who were interested in boats. Fifty percent of the use of the boats was in connection with petitioner's trade or business. The coke dispensing machine was placed in the laboratory building where petitioner's employees *58 worked regularly. It was used in connection with petitioner's trade or business. Year ended October 31, 1956: In its return for this year the petitioner deducted $7,829.59 for depreciation of recreation facilities. In Schedule J of the return petitioner explained this deduction as follows: Kind of property:
Recreation Facilities
Date acquired:
Various
Cost or other basis:
$56,281.20
Depreciation
prior year:
$392.89
Method:
Declining Balance
Rate (%) or life:
Various
Depreciation:
$7,829.59
The respondent disallowed the deduction for the same reason given for the previous year. The claimed depreciation is based on items purchased by petitioner during the preceding year of $3,928.93, plus items purchased by petitioner during the taxable year ended October 31, 1956, of $52,352.27, or a total cost of $56,281.20. The items purchased during the second year and the cost thereof are as follows: (a) Rugs, drapes and furniture for
the main house
$ 4,639.57
(b) Rugs, furniture and television
equipment for the clubhouse
5,410.29
(c) 43-foot Richardson motorboat and
depth-sounding equipment there-
for
41,199.52
(d) TV antenna and amplifiers for
the main house and clubhouse
television sets
250.50
(e) Draperies for the clubhouse and
the accounting office
852.39
Total
$52,352.27
Fifty *59 percent of item (c) was used in connection with petitioner's trade or business. All of the other items and 50 percent of item (c) were for the personal use of the Sticklers. Years ended October 31, 1957, 1958, and 1959: For the fiscal year ended October 31, 1957, petitioner claimed a deduction of $12,055.89 on the recreation facilities which it acquired during the two preceding years at a cost of $56,281.20. For the fiscal year ended October 31, 1958, petitioner claimed a deduction of $7,333.53 on the recreation facilities which it acquired during the two taxable years ended October 31, 1955, and 1956 and which had not been disposed of during the fiscal year ended October 31, 1958. The 43-foot boat was sold during the fiscal year ended October 31, 1958. For the fiscal year ended October 31, 1959, petitioner claimed a deduction of $1,754.60 on the recreation facilities which it acquired during the two taxable years ended October 31, 1955, and 1956 except for the 43-foot boat which was disposed of during the fiscal year ended October 31, 1958. The respondent disallowed the deductions claimed for depreciation on the recreation facilities for these three years for the same reason given *60 for the taxable year ended October 31, 1955. Issue 8 - (Litigation Costs) Petitioner claimed a deduction on its corporate income tax return for the fiscal year ended October 31, 1957, in the amount of $101,223.78, for ordinary and necessary business expenses. Respondent disallowed the entire amount on the ground that it "Represents the disallowance of costs applicable to criminal trial." [5] E. J. Charters Associates: Eugene J. Charters, hereinafter sometimes called Charters, for some years had been a member of the Federal Bureau of Investigation and, after his termination with the Bureau, he started his own investigatory agency, and had other investigation agents on his staff. Charters operated a business known as E. J. Charters Associates, hereinafter sometimes called Charters' firm, during the period from March 20, 1956, through December 27, 1956. During this period Charters' firm was engaged by petitioner *61 to perform certain services commencing on March 20, 1956, and terminating early in November 1956. Services to be rendered by Charters' firm were to include only the investigation of certain charges made by the Pennsylvania Turnpike Commission against petitioner prior to March 20, 1956. This investigation included the securing of statements from employees of petitioner working on the Northeast Extension of the PennsylvaniaTurnpike and also included the investigation of certain political figures prominent in Pennsylvania politics at that time. Substantially all of the services performed by Charters' firm for petitioner preceded a request by the then Attorney General for a special grand jury investigation and the convening of a special grand jury. Charters was never consulted by petitioner concerning criminal litigation instituted by the Commonwealth of Pennsylvania, nor was he informed that the results of the investigation were needed for said criminal litigation but, instead, was informed that the investigation was necessary for the protection of the reputation of petitioner concerning charges made by the Pennsylvania Turnpike Commission prior to March 20, 1956. Petitioner claimed *62 a deduction of $38,152.09 on its return for the fiscal year ended October 31, 1957, for the services rendered by Charters' firm. This represented a reasonable charge by Charters' firm for the services it rendered. Henry P. Cole: Henry P. Cole was a sales representative of petitioner and was paid $6,988.13 by petitioner for services rendered in connection with the expansion of its business in domestic and foreign markets and in attempting to effect a sale of petitioner's business. None of the compensation paid Cole was paid for services rendered in connection with criminal litigation in which petitioner or its officers was involved with the Commonwealth of Pennsylvania. Cole's services with petitioner were terminated on November 5, 1956, before any indictments were returned by the grand jury. Petitioner claimed a deduction of $22,366.89 on its return for the fiscal year ended October 31, 1957, for the services rendered by Cole. The amount of $6,988.13 paid by petitioner to Cole represented a reasonable charge by Cole for the services he rendered. C. A. Landsidle: Landsidle, who was petitioner's executive vice president, terminated his employment with petitioner by resignation effective *63 March 31, 1957. For his services as an officer of petitioner during the fiscal year ended October 31, 1957, to the date of his resignation he was paid $4,900 by petitioner. The amount of $4,900 represented a reasonable charge by Landsidle for the services he rendered. Issue 9 - (Domestic Help) Petitioner claimed a deduction on its corporate income tax return for salaries for the taxable year ended October 31, 1956, in the amount of $1,200. The said sum of $1,200 represents payment to domestic help, charged to petitioner's operations. Respondent disallowed the claimed deduction and, in a statement attached to the deficiency notice, explained his disallowance as follows: (f) The deduction for salaries expense is disallowed in the amount of $1,200.00 inasmuch as it represents payment to domestic help of Charles W. Stickler, Jr., charged to operations. During petitioner's taxable year ended October 31, 1956, and beginning in January 1956, petitioner paid for the domestic help who took care of cleaning, cooking and serving meals in the main house, and for the person who took care of the Angelica grounds which included not only the main house but the garage apartment used as an actual office *64 by petitioner, the laboratory building and the clubhouse. The total amount paid by petitioner to such persons during that taxable year was $4,365. Petitioner billed Stickler for $1,582.50 of these charges, and was reimbursed in that amount by Stickler. This payment by Stickler left $2,782.50 for domestic help as being paid by petitioner. Of this $2,782.50 respondent disallowed $1,200. The Sticklers also provided board and lodging in the main house for some of the domestics. Issue 10 - (Boat Loss) On its return for the fiscal year ended October 31, 1958, petitioner claimed a loss of $4,369.84 [6] based upon the following information given in the return: Description of property:
Recreation Facilities
Date acquired:
1956
Date sold:
1958
Gross sales price:
$20,000.00
Depreciation allowed (or
allowable):
15,450.16
Cost or other basis:
39,820.00
Gain or (loss):
(4,369.84)
The respondent disallowed the claimed loss and explained his disallowance thus: (B) Loss on Sale - Recreation *65 Facilities $4,369.84 The Richardson Cruiser as a recreational facility asset was acquired for a cost of $39,820.00 and sold for $20,000.00 for a loss of $19,820.00. The loss, adjusted for depreciation claimed within the form 1120 I. Tax returns, is shown as $4,369.84. Inasmuch as the asset was acquired for the personal use of the principal officer, and depreciation is considered to be non-business - the loss is also disallowed. Fifty percent of the use of the boat was in connection with petitioner's trade or business. The loss of $4,369.84 claimed on petitioner's return for the fiscal year ended October 31, 1958, was only one item out of 11 items reported on its return as "Long-Term Capital Gains and Losses - Assets Held for More Than 6 Months," in which schedule the long-term capital gains exceeded the long-term capital losses. Issue 11 - (Miscellaneous Expense) Petitioner claimed a deduction on its return for the fiscal year ended October 31, 1958, in the amount of $3,782, for general administrative and miscellaneous expense in connection with the sale of the boat considered under Issue 10. The respondent disallowed the claimed deduction and explained his disallowance thus: (c) General and Administrative Misc.
Exp.
$3,782.00
The *66 Richardson Cruiser "Peggy III," was sold by The Seaboard Surety Co. to McKee and McHale, Inc., as part of the terms of their agreement with Manu-Mine. $20,000.00 was received, and the net proceeds of $16,218.00 was used to reduce the principal of loan with First National City Bk. of N. Y.
The balance of $3,782.00 charged to Acct #921 represented the following: Commission on Sale
$2,000.00
Labor to refinish cruiser
570.00
Materials to refinish
166.00
Insurance on cruiser
846.00
Slip rental
200.00
Total
$3,782.00 This expense has been considered non-deductible because the boat had been used for the personal pleasure of the principal officer. Fifty percent of the use of the boat was in connection with petitioner's trade or business. Issue 13 - (Net Losses) Prior to giving effect to the additional deductions allowed herein for compensation of officers, depreciation, litigation costs, boat loss, and miscellaneous expense, petitioner had net operating losses for the fiscal years ended October 31, 1957, 1958, and 1959 of $1,794,908.79, $261,757.72, and $202,266.41, respectively. Opinion Issues 1 and 2. In a statement attached to the deficiency notice the respondent said: Purchase expense claimed by *67 you as deductions in the taxable years ended October 31, 1955 and October 31, 1956 are excessive in the respective amounts of $146,484.18 and $231.041.91. The parties have stipulated that during the taxable year ended October 31, 1956, cash in the total amount of $205,000 was returned to Manu-Mine and credited to purchases by Manu-Mine "thereby offsetting the effect upon taxable income of the disallowed purchases" mentioned in the above statement attached to the deficiency notice. Petitioner concedes that due to the unforeseen death of Richard H. Evans it has been impossible for petitioner to prove that Evans actually purchased pipe and other materials for petitioner with the $146,484.18 and $26,041.91 ($231,041.91 minus $205,000) turned over to Evans through B & W and D & E during the approximately 6-month period from July 6, 1955, to January 16, 1956, and that it must, therefore, agree that its income for the taxable years ended October 31, 1955, and October 31, 1956, should be increased by $146,484.18 and $26,041.91, respectively. But this does not necessarily mean that any "underpayment" of tax due to the disallowed purchases "is due to fraud" under section 6653(b), I.R.C. 1954, *68 [7] as determined and contended for by the respondent. The burden of proof as to fraud is upon the respondent. Section 7454, I.R.C. 1954. [8] The proof must be by clear and convincing evidence that some part of the underpayment for each year in issue was due to fraud with intent to evade tax. Arlette Coat Co., 14 T.C. 751, 756; Albert R. McGovern, 42 T.C. 1148, 1150, affirmed by order of C.A. 6, April 20, 1966; Cefalu v. Commissioner, 276 F. 2d 122, 128 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court. Respondent in his answer charged petitioner with intent to evade tax with respect to each and every adjustment made by the respondent in the deficiency *69 notice. His only charge of fraud now is in relation to the disallowed purchases under Issue 1, for in his brief he states: The following tabulation shows the computation of the fraud items for the purposes of this case: Fiscal Year Ended
Particulars
10/31/55
10/31/56
Overstated purchases: D & E Sporting Goods
Co.
$ 69,534.25
$159,132.66
B & W Trading Cor-
poration
81,243.00
76,068.75
B & W Trading Cor-
poration
(4,294.00)
(4,159.50)
Total Overstated Pur-
chases
$146,484.18
$231,041.91
Less: Journal Entry No.
50-32
205,000.00
Net Overstated Pur-
chases
$146,484.18
$ 26,041.91
In the deficiency notice the respondent increased petitioner's taxable income for the two taxable years from a total taxable income reported of $2,554,093.79 to a total so-called corrected taxable income of $4,256,854.53, or a total increase of $1,702,760.74 without allowing any deduction under section 172, Part VI, I.R.C. 1954, for net operating loss carrybacks for the three fiscal years ended October 31, 1957, October 31, 1958, and October 31, 1959, although in the statement attached to the deficiency notice he stated: In making this determination of your income tax liability, careful consideration has been given to your claims for refund *70 filed on October 30, 1958 and (2) on January 20, 1960. [These claims for refund claimed deductions for the net operating loss carrybacks.] Respondent now concedes that $1,342,353.10 of the determined increase of $1,702,760.74 was in error, thus leaving only a contended-for increase (prior to the application of the net loss carrybacks now conceded by the respondent to be "at least" $2,258,932.92) of $360,407.64, of which the disallowed purchases for both years of $172,526.09 constitute a large part and, as stated above, petitioner concedes that its income for the two taxable years should be increased by the $172,526.09 of disallowed purchases. In its reply brief petitioner concluded, in part, as follows: When the issues in this case were framed by the pleadings, the amounts in dispute either as additional income or disallowed expense, totalled [$1,870,741.11 ($1,702,760.74 plus $167,980.37 of net loss carryback items)]. By Part I of the Stipulation Respondent conceded the purchases credit of $205,000 and Petitioner conceded its inability to support the balance of that deduction or $172,526.09. Despite the very extensive stipulations between the parties, no other items could be settled *71 up to the time of trial so that at that time the total of disputed items was [$1,493,215.02]. Upon the completion of the trial record which contains no disputes as to the basic facts, Respondent has found it necessary to concede the income item of $1,125,053.10, litigation costs to the extent of [$48,104.80] and bad debts to the extent of $33,786.50. Thus, the case has now been reduced to a point where the disputed items total only [$286,216.39], which excludes, of course, the bad debt items totaling $54.23 which Petitioner had to concede for lack of evidence. * * *
[Petitioner] is naturally gratified that Respondent has found it necessary to concede such a substantial amount. The effect, however, is to alter completely the complexion of the case. In preparing the case for trial, gathering evidence, preparing stipulations and presenting evidence, attention had to be paid to items in accordance with their relative importance. What was relatively important when the case involved [$1,493,215.02] is far different from what is relatively important when the case involves only [$286,216.39] [9] * * * *72 We think these substantial concessions on the part of respondent justify us in taking a somewhat exacting attitude in considering and evaluating the positions taken by respondent with respect to the balance of the items in this proceeding, especially the issue of fraud. Petitioner's method of making the alleged purchases of pipe and other materials through B & W and D & E were at least unorthodox. But we have carefully analyzed all of the evidence and are satisfied that no fraud has been established. Most of the essential facts were stipulated such as the dates, check numbers and the amount of the checks issued by petitioner to B & W and D & E for the invoices rendered by those companies, together with the return to petitioner during the taxable year ended October 31, 1956, of $205,000 in cash. We think these checks were issued for the express purpose of supplying Richard H. Evans with ready cash to enable him to purchase pipe and other hard-to-get materials for petitioner to use in executing the February 28, 1955, contract with the Pennsylvania Turnpike Commission. While the method used may have been unusual, we do not think that the record establishes that any fraud was practiced *73 or intended on the part of petitioner. Stickler testified at some length. His testimony was frank and was given without any reservations. An example of his testimony on cross-examination, when asked to explain petitioner's method of making the alleged purchases, is in part as follows: A I relied particularly on the fact that here we were suddenly thrust with a tremendous job of getting all these holes in over a very, very short duration of time. We ordinarily would have put lot quantities of orders in to the steel mills for this pipe. About this time was the threatened major steel strike. We expected the mills all to be closed, and we were here holding this very heavy contract. We had to get pipe. And we gave our local supplier [Reading Heater & Supply Co., Inc.] an order. It staggered them because it was a whole mill run, and they had never had a piece of business like this. We had to give them cash in advance, so to speak. We gave them checks covering future deliveries of pipe from other responsible sources of the steel mills, just to try and get this pipe. Knowing that even that was not going to be enough - these holes averaged about 150 to 200 foot [feet] deep, and 6,000 to 7,000 *74 of them. Plus the fact that this was not all of the holes that we were contemplating drilling. We had not yet been provided with the full planning of the Turnpike as to other areas that had not been set up yet. And the only thing that we could conceive of doing in getting this pipe was to go out to the old coal companies going out of business, or out of business. We knew they had to case holes in the past. We looked into every junk yard, and that was Richard's primary responsibility, to give them cash on the spot for whatever they could give to us. Q According to your testimony, you don't have the slightest idea if you got any pipe. And if that was what you were after, what is your explanation? A Richard Evans died at the most unfortunate - it's unfortunate to die, but unfortunately he died also at the most inconvenient time we could have experienced. He was to give me a record. He told me he would have a record for me of this pipe. We have never received that record. He was in such condition at the hospital that it was impossible to talk to him. And I am sure that somewhere along the line we would have had a very reliable explanation of what his activities were and what he had done *75 with the pipe. We made every effort to go out in the field and try to determine where this pipe could have been. We sent men out to look into junk yards. We knew a lot of it had been stolen, because that's the practice up in that particular area in the isolated sections that we were. And we knew that some had been stolen, a lot of it had been buried. We had Hurricane Hazel. That came along in the process of doing this job and wiped out a lot of our work. And when you are faced with the pressure of getting this done, you give the order to get out and get the material, get it there. Your only concern is that somebody is going to complain that they don't have enough. The testimony of Stickler is well corroborated from other sources. Large orders for new pipe were placed with Reading Heater & Supply Co., Inc., between April and December of 1955, for which petitioner was required to make advance payments due to shortages. Palmer M. Evans (unrelated to Richard H. Evans) and Danchak both testified before respondent's special agent, and the parties stipulated that, if called to testify in this proceeding, they would testify in accordance with the transcripts of those examinations. The transcripts *76 were received in evidence, and respondent heavily relies upon the testimony of Evans and Danchak. The testimony of Palmer M. Evans and Danchak, however, is quite similar. It was that Richard H. Evans told each of them (a) to submit invoices to petitioner; (b) not to include the invoices in the records of those companies; (c) to cash, rather than deposit, petitioner's checks in payment of those invoices and to turn the proceeds over to Richard. Richard indicated to each of them that their respective companies were not involved in the transactions in any substantive way. It was particularly significant to note that Danchak, who testified in June and October of 1958, long before the present issues were raised by the notice of deficiency, stated that Richard H. Evans had told him that there was nothing wrong involved in these transactions; that he was using the money on the road to buy pipe and equipment for petitioner; that he was trying to buy as much pipe for petitioner as he could; that he was purchasing from junkmen and second-hand dealers all around the country and as far as New York; and that he was using cash in order to get the materials quicker. This is substantially the same *77 testimony that was later given by Stickler in the hearing before us. Respondent also offered the testimony of the special agent who had interrogated Palmer M. Evans and Danchak. His testimony indicates that what he found and was told is not inconsistent with Stickler's testimony of what transpired. For instance, the special agent said: From our questioning of the officers of B & W and D & E we were told that the amounts representing unreported receipts by these corporations and also representing checks that were cashed by officers of both of these corporations, that the proceeds from these cashings of checks were turned in to a Richard Evans, who our investigation showed was an officer in both corporations, both B & W and D & E, and also an officer of Manu-Mine, and also related to the president of Manu-Mine, and also a son of the Turnpike Commission Commissioner at the time these contracts had been let. In view of this and in view of the way the transactions had been handled, which I concluded were not the normal manner in which most businesses would handle these transactions, we questioned the accountants of Manu-Mine and also the president of Manu-Mine relative to the purpose for *78 handling these transactions in this manner, and we received the same explanation that was testified to here in court. We do not think the facts here of record present the clear and convincing evidence of fraud required by the statute. Whether there were fraudulent purchase deductions or false entries by petitioner depends upon a careful analysis of all the evidence. We know of no concealment or efforts on the part of petitioner or its officers to mislead the investigating agents as to the true facts. In fact, we think the record shows complete cooperation with the agents on the part of petitioner and its officers. The only fact which we think can be said to be adverse to petitioner is the unorthodox manner petitioner, through its officers, adopted to supply Richard H. Evans with the cash necessary to purchase pipe and materials for petitioner. But we think Stickler has made a sufficient explanation as to why it was done that way as to take away any inference that petitioner was trying to defraud the Government of its taxes. The fact that $205,000 of the cash thus advanced was returned to petitioner as not needed for the contemplated purchases long before any issue of the advances was *79 raised by the Government is strong evidence, we think, that the remainder of $172,526.09 was advanced to Evans for the purpose of buying the much needed pipe and other materials for petitioner. Stickler testified unequivocally that that was the purpose and that Evans was to make a report to him of all that he purchased and Evans told Danchak the same thing at the time Danchak was turning the cash over to Evans. If Evans had lived and had made the report to petitioner that he was to have made, it may well be that this issue of fraud would not have arisen and petitioner may have been allowed further deductions for purchases totaling $172,526.09. But the unexpected death of Richard H. Evans intervened. Petitioner's inability to substantiate the deductions for purchases totaling $172,526.09 causes it to lose the deductions, but this fact, however, does not establish fraud. Cf. Oscar G. Joseph, 32 B.T.A. 1192, 1204. The determination of the deficiency has placed the burden of proof on the petitioner, a burden it has been unable to meet because of Evans' death, but respondent may not use this fact as a substitute for the necessary proof of fraud. As was stated in Carter v. Campbell, 264 F. 2d 930, 936 *80 (C.A. 5, 1959): Where the case involves both a deficiency and a civil fraud penalty, each party has its own peculiar burden of proof. n15 The result is, as we once pointed out, Snell Isle, Inc. v. Commissioner, 5 Cir., 1937, 90 F. 2d 481, certiorari denied 302 U.S. 734, 58 S. Ct. 120, 82 L. Ed. 568, the case may end in a standoff from the failure of each party to go ahead with his evidence. n16 The taxpayer fails on the deficiency. The Government fails on the fraud penalty. Failure of the taxpayer to overcome the deficiency does not create a presumption of fraud. See also Olinger v. Commissioner, 5 Cir., 1956, 234 F. 2d 823. [Footnotes omitted.] On this fraud issue we think respondent properly omitted any contention or argument regarding the litigation captioned Commonwealth v. Evans, 190 Pa. Super. 179, 154 A. 2d 57, affirmed per curiam by the Supreme Court of Pennsylvania, 399 Pa. 387, 160 A. 2d 407, referred to in our general findings, supra. It is interesting to note that no evidence has been introduced which suggests that Stickler and his wife, who owned nearly all of the stock of Manu-Mine, received any of the funds that passed to Evans for their personal use, which funds *81 we have found were received by Evans for the purpose of buying pipe needed by the petitioner. We hold respondent has not shown by clear and convincing evidence that any underpayment of petitioner's taxes for the taxable years ended October 31, 1955, and October 31, 1956, was due to fraud. Issue 3 - (Compensation of Officers) Section 162, I.R.C. 1954, provides: (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered * * *. Whether the compensation petitioner paid Stickler, Evans, and Nellie during the fiscal years ended October 31, 1955, 1956, and 1957 constituted reasonable allowances for personal services actually rendered so as to be deductible under the above statute is a question of fact to be determined on the basis of the particular circumstances in the case. Ecco High Frequency Corp. v. Commissioner, 167 F. 2d 583, 585 (C.A. 2, 1948), affirming a Memorandum Opinion of this Court, certiorari denied 335 U.S. 825; Geiger & Peters, Inc., 27 T.C. 911, 920; *82 Huckins Tool & Die, Inc. v. Commissioner, 289 F. 2d 549, 552 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court. Respondent's determination as to reasonableness is presumed to be correct, and the burden is upon petitioner to prove otherwise. Botany Worsted Mills v. United States, 278 U.S. 282. We think petitioner has met this burden in part. Stickler and Nellie both testified at considerable length regarding the nature of the work they performed for petitioner as well as the nature of the work that Evans performed prior to his death on January 18, 1956. After obtaining the contract with the Pennsylvania Turnpike Commission on February 28, 1955, petitioner's volume of business increased tremendously. The number of its employees increased about 600 percent and its gross income increased from $815,000 in 1954 to over $5,238,000 in 1955. This meant greater responsibilities and more work on the part of petitioner's officers. Notwithstanding this increase in responsibilities and work, respondent allowed Stickler and Evans a compensation of $45,000 and $21,000, respectively, in 1954, but only $25,000 and $10,000, respectively, in 1955. In Ridgewood Provisions, Inc., 6 T.C. 87, *83 we held that the allowance of compensation deductions by the Commissioner in one year was some evidence of the reasonableness for the next year. With increased responsibilities and added effort in 1955, a reasonable amount of compensation for these two officers would appear to be greater in 1955 than it was in 1954 instead of less. Nellie's compensation in the three years prior to 1955 was small considering the duties she performed. Her compensation in 1955 and 1956 was in partial recognition of the fact that she received inadequate compensation in the earlier years and because petitioner was in a better position to pay in the later years, thus bringing into application the principle enunciated in Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930), that the statute does not require that the services should be actually rendered during the taxable year. Petitioner called a well-qualified expert witness on the subject of executive compensation. This expert, hereinafter called the expert, testified that in his opinion the compensation paid to Stickler in the taxable year 1955, totaling $61,400, was reasonable and fell within the range of compensation paid by comparable companies for similar *84 responsibilities, which range he estimated was between $50,000 and $75,000 per year. For the year 1956 the expert testified that Stickler's compensation of $109,750 was on the high side. The expert considered compensation in the amount of $85,000 to be reasonable. While the range of compensation paid by other organizations for officers with similar responsibilities was in the neighborhood of $50,000 to $75,000, he felt that $85,000 was justified by reason of the fact that some companies did pay in excess of those ranges and because, with respect to petitioner, this was the second year evidencing a substantial growth over prior years of much lower volume. In this connection, the expert took into consideration and considered as possible income to petitioner in 1956 petitioner's claim against the Pennsylvania Turnpike Commission for services rendered in 1956 of over $1,125,000. Regarding the compensation paid to Evans during the fiscal year 1955 of $28,500, the expert testified that in his opinion such compensation was reasonable and within the range of $18,000 to $30,000 which other organizations under similar circumstances paid for services of the kind performed by Evans. The expert *85 testified that Nellie's compensation of $11,600 in the taxable year 1955 was reasonable and, under the range of compensation to persons in similar organizations with similar responsibilities, which range he gave as $13,000 to $20,000. He further testified that her compensation of $25,100 in the taxable year 1956 was reasonable and within the range of $17,000 to $26,000 which one might expect for similar duties in comparable companies. The expert thought this increase over the prior year was justified in view of petitioner's continued success and Nellie's lack of compensation in the earlier years. Despite the drastic reductions in petitioner's fortunes in 1957, the expert believed that her salary of $6,120 in that year was reasonable. We have carefully considered all of the evidence and have concluded that the compensation paid the three officers in the taxable year ended October 31, 1955, and the $6,120 paid Nellie in the fiscal year ended October 31, 1957, were reasonable and allowable under section 162(a)(1), supra. However, we think the evidence shows that the compensation paid Stickler and his wife for the taxable year ended October 31, 1956, of $109,750 and $25,100, respectively, *86 was excessive but not as excessive as determined by the respondent. We believe and have found as a fact that a reasonable allowance for that year is $75,000 for Stickler and $12,000 for Nellie. We so hold. Issue 5 - (Trip to Hawaii) Petitioner claims that $5,189.07 of the entire cost of the trip to Hawaii of approximately $8,000 is deductible by it under section 162, I.R.C. 1954, the material part of which is in the margin. [10] Respondent contends that the entire cost of the trip represented personal, living and family expenses as those terms are used in section 262, I.R.C. 1954, [11] *87 and as such are not deductible by petitioner under section 162, supra. We think the evidence is clear that some part of the cost of the trip was an ordinary and necessary expense incurred during the taxable year ended October 31, 1955, in carrying on petitioner's trade or business. We have found that part to be $3,000, which amount we hold is deductible by petitioner under section 162, supra. Cf. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Issue 6 - (Entertainment Expenses) A better name for these expenses would seem to be "compensation for services rendered" but the nomenclature used is that stated in the deficiency notice and the stipulation of facts. Be that as it may, the amounts paid to Constance and Elizabeth were paid for services actually rendered to petitioner by these two persons during 3 months of the taxable year ended October 31, 1955. They were ordinary, necessary, reasonable in amount and are deductible by petitioner under section 162, supra. Issue 7 - (Depreciation) During the 5 years ended October 31, 1955, through 1959, petitioner claimed a total depreciation of $29,366.50 on recreation facilities that cost petitioner $56,281.20. Respondent disallowed the entire amount claimed on the ground that the said *88 facilities were not "used in the trade or business" as that phrase is used in section 167, I.R.C. 1954. [12]
Respondent has not questioned the cost of the property or the method and the rate of depreciation that were used. His only objection is that the property was not used for business purposes. We have found in our findings that 50 percent of the use of the boats and 100 percent of the use of the coke machine were in connection with petitioner's trade or business. Since there is no disagreement on the other depreciation factors, we hold that petitioner is entitled to 50 percent of the depreciation claimed on the boats and all of the depreciation claimed on the coke machine, which amounts the parties can determine in the recomputations to be made under Rule 50. As to the boats, cf. Cohan v. Commissioner, supra; and Challenge Manufacturing Co., 37 T.C. 650 (Issue 1). On the other items we sustain the respondent's determination *89 for insufficient proof. Issue 8 - (Litigation Costs) At the outset, it should be noted that the parties have stipulated that all of the amounts involved under this issue "were reasonable charges for the services rendered." E. J. Charters Associates: Charters' firm rendered services to petitioner. Petitioner paid $38,152.09 for those services. The services rendered were in connection with the civil litigation between petitioner and the Pennsylvania Turnpike Commission. The first indication which petitioner had that any criminal charges might arise out of these circumstances was at about the time of the petition by the then Attorney General for a special grand jury investigation. Virtually all of the services of Charters' firm preceded this date and were completed early in November of 1956 before any indictments were returned on January 25, 1957. We hold that the above amount paid to Charters' firm was an ordinary and necessary expense of petitioner's business and is deductible under section 162(a), supra. Commissioner v. Tellier, 383 U.S. 687 (1966). In that case the Supreme Court, at p. 694, discussed the categories in which deductions falling within the definition of section 162(a) *90 could be disallowed which were "sharply limited and carefully defined." The facts of this case do not fall within any of those categories. Henry P. Cole: The amount of $6,988.13 paid by petitioner to Henry P. Cole is clearly deductible as an ordinary and necessary expense under section 162(a), supra. No part of the compensation paid Cole was paid for services rendered in connection with criminal litigation as had been determined by respondent. It was stipulated, however, that the petitioner on its return for the fiscal year ended October 31, 1957, actually deducted $22,366.89 as having been paid to Cole. It would, therefore, appear that petitioner claimed excessive compensation paid to Cole of $15,378.76, and that respondent's determination should be sustained to that extent. C. A. Landsidle: The $4,900 paid to Landsidle is in the same category as the $6,988.13 paid to Cole. No part of it was paid for services rendered in connection with the criminal litigation which took place after Landsidle's resignation. The amount is deductible under section 162(a), supra. The respondent erred in disallowing the deduction. Issue 9 - (Domestic Help) Petitioner has requested us to find that "The *91 allocation of the total cost of those domestics between the Sticklers and petitioner was reasonable and the $2,782.50 paid by petitioner represented a reasonable allowance for compensation for services actually rendered to it in the conduct of its business." The respondent, however, determined that $1,200 of the $2,782.50 represented personal, living and family expenses of the Sticklers and, as such, no deduction for the $1,200 could be allowed under the provisions of section 262, I.R.C. 1954, supra. [13] Of the total amount paid by petitioner of $4,365, Stickler reimbursed petitioner in the amount of $1,582.50, and by disallowing $1,200, the respondent has apparently allowed petitioner a deduction of $1,582.50. We do not think petitioner has sustained its burden of proving the respondent's determination to be in error. We sustain the respondent. Issue 10 - (Boat Loss) In his brief, regarding the boat loss, the respondent states that "Respondent is of the view that Manu-Mine does not have an allowable loss in this instance because it was a personal item purchased for Charles W. Stickler, Jr." We have found, however, that 50 percent of the use of the boat was in connection *92 with petitioner's trade or business. We have also found that the loss was a long-term capital loss and that petitioner had long-term capital gains for the year ended October 31, 1958, in excess of the long-term capital losses. Therefore, we hold petitioner is entitled to deduct 50 percent of its long-term capital loss from the sale of its boat. Cf. G.C.M. 8628 (IX- 2 C.B. 112); Rev. Rul. 286 (1953-2 C.B. 20); Sharp v. United States, 199 F. Supp. 743 (1961), affirmed per curiam, 303 F. 2d 783 (C.A. 3, 1962). Section 165(a) [14] *93 provides that "There shall be allowed as deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(b) provides that "the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 * * *." Section 1011 provides: The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters * * * P (relating to capital gains and losses)), adjusted as provided in section 1016. Section 1012 provides that "The basis of property shall be the cost of such property * * *." Subchapter P comprises four parts with sections numbered from 1201 to 1250, inclusive. Section 1016(a)(2) provides that proper adjustment in respect of the property shall in all cases be made for exhaustion, wear and tear (depreciation) allowed. Returning to section 165, subsection (f) thereof provides: Capital Losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. Section 1212 is inapplicable but section 1211 is as follows: SEC. 1211. LIMITATION ON CAPITAL LOSSES. (a) Corporations. - In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges. On the basis of the above authorities, we hold petitioner is entitled to deduct a long-term capital loss from its long-term capital gains on the sale of the boat of $4,075.92 computed as follows: 50% of cost
$19,910.00
Adjusted for depreciation
7,725.08
Adjusted basis
$12,184.92
Less 50% of selling price
10,000.00
Deductible loss
$ 2,184.92
The *94 limitation provided in section 1211 is not applicable since petitioner had sufficient long-term capital gains from which to deduct the long-term capital loss. Issue 11 - (Miscellaneous Expense) This issue involves expenses in connection with the sale of the boat considered under Issue 10. The parties stipulated that the amount of $3,782 was claimed by petitioner in its return for the fiscal year ended October 31, 1958, as "general administrative and miscellaneous expense, which respondent disallowed on the following grounds * * *. This expense has been considered nondeductible because the boat had been used for the personal pleasure of the principal officer." We have found that 50 percent of the use of the boat was in connection with petitioner's trade or business. We hold that 50 percent of the commission on the sale of $2,000, or $1,000, should be allowed as an additional capital loss on the sale of the boat and that 50 percent of the balance of the expenses of $1,782 should be allowed as an ordinary and necessary expense of petitioner's business. Issue 13 - (Net Losses) The respondent in his brief concedes that petitioner is entitled to deductions under section 172, I.R.C. 1954, *95 in its taxable years for net operating loss carrybacks from the three subsequent years ended October 31, 1957, 1958, and 1959 of "at least" the respective amounts of $1,794,908.79, $261,757.72, and $202,266.41. To these amounts should be added under the recomputations to be made under Rule 50 the deductions allowed herein for those years regarding compensation of officers, depreciation, litigation costs, boat loss and miscellaneous expense. Decision will be entered under Rule 50. Footnotes
1. Stated in return filed for fiscal year ended October 31, 1957, as $1,876.003.66.↩
*. Petitioner acquired these shares from the Evans Estate in May 1956.↩
*. D & E is referred to in the stipulation of facts and in the record both as D. and E. Sporting Goods Company and as D. and E. Sporting Goods Corp.↩
2. It may be noted that the total of these two checks was $38,752.50, whereas the parties have stipulated that petitioner received from Danchak the amount of $40,000.↩
3. Because, due to the untimely death of Richard H. Evans, petitioner has been unable to establish the basis for deductions for purchases in the amount of $146,484.18 for the taxable year ended October 31, 1955, and $26,041.91 ($231,041.91 - $205,000) for the taxable year ended October 31, 1956, the disallowance of the deductions in those amounts is not disputed by petitioner.
*. Represents gross sales.↩
4. It may be noted that the total amounts paid to Constance and Elizabeth were $1,930, whereas the amount disallowed by the respondent was $1,920. The discrepancy is regarded as de minimis.↩
5. As previously stated in listing the issues, respondent now concedes that $35,804.80 of the $101,223.78 should be allowed. The remaining $65,418.98 represents three items as follows: ↩
E. J. Charters Associates
$38,152.09
Henry P. Cole
22,366.89
C. A. Landsidle
4,900.00
Total
$65,418.98
6. This represents the claimed loss on the sale of the 43-foot boat, one of the three boats involved in Issue 7 (Depreciation) wherein we found that 50 percent of the use of the boats was in connection with petitioner's trade or business.↩
7. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * ↩
8. SEC. 7454. BURDEN OF PROOF IN FRAUD AND TRANSFEREE CASES. (a) Fraud. - In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.↩
9. The $286,216.39 is composed of the following remaining issues: ↩
Issue 3
Compensation of Officers
$174,970.00
Issue 5
Trip to Hawaii
5,189.07
Issue 6
Entertainment expenses
1,920.00
Issue 7
Depreciation disallowed
29,366.50
Issue 8
Litigation costs
65,418.98
Issue 9
Domestic help
1,200.00
Issue 10
Boat loss
4,369.84
Issue 11
Miscellaneous expense
3,782.00
Total
$286,216.39
10. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business * * *↩
11. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.
12. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business * * *.↩
13. See footnote 11.↩
14. All sections referred to under this issue are of the Internal Revenue Code of 1954.