## Commonwealth *v.* Evans, Appellant.

Argued March 14, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, BOK and EAGEN, JJ.

388

*H. G. Stutzman,* with him *David S. Kohn,* and *Stutzman, Lewis & Sidoriak,* and *Kohn, Adler & Schatt,* for Thomas J. Evans, appellant.

*David J. Conroy,* for Clayton A. Landsidle, appellant.

*Earl V. Compton* and *Frederick G. McGavin,* for Charles W. Stickler, appellant.

*Ernest S. Burch,* with him *James H. Stewart, Jr.,* and *Nauman, Smith, Shissler & Hall,* for James F. Torrance, appellant.

*Huette F. Dowling,* Special Deputy Attorney General, with him *Mary E. Hoerner,* Assistant District Attorney, *Vincent G. Panati,* Assistant Attorney General, *Alfred P. Filippone,* Deputy Attorney General, *Martin H. Lock,* District Attorney, and *Anne X. Alpern,* Attorney General, for Commonwealth, appellee.

OPINION PER CURIAM, April 21, 1960:

The order and judgments of the Superior Court are affirmed on the opinion of President Judge RHODES, reported at 190 Pa. Superior Ct. 179.

Mr. Justice COHEN took no part in the consideration or decision of this case.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE BELL:

A gigantic fraud was perpetrated on the Commonwealth of Pennsylvania in connection with the construction of a part of the Northeastern Extension of the Pennsylvania Turnpike, for which a number of people have been convicted and duly sentenced. Evans, a former Chairman of the Commission, and Torrance, a former member and former Secretary-Treasurer of the Commission, were convicted on separate indictments of misbehavior in office and of conspiracy with others to cheat and defraud the Pennsylvania Turnpike Commission. The Superior Court unanimously reversed the conviction of Torrance on the charge of misbehavior in office, reversed the judgment of sentence of one Paul J. McNeill on the indictment charging conspiracy, and by a vote of four to three sustained a conviction of Evans, Torrance and two others on the conspiracy charge.

The crime of conspiracy for which these defendants were convicted "arose principally out of a contract dated February 28, 1955, between the commission and Manu-Mine." *Commonwealth v. Evans et al.*, 190 Pa. Superior Ct. 179, 195. The purpose of the contract was to provide surface support for the right-of-way of the Northeastern Extension of the Turnpike across the anthracite coal regions by the use of slushing material into mine voids underlying the roadway area, which land had been appropriated by the Commission for part of the Northeast Highway.

The basic questions involved in these appeals are two-fold: (1) Was the Commonwealth's evidence legally sufficient to prove beyond a reasonable doubt that *each* of these particular defendants was guilty of criminal conspiracy to perpetrate this fraud; and (2) Did the admission of Paul's testimony constitute reversible error?

The contract of February 28, 1955, made by the Commission and Manu-Mine Company was first negotiated and approved by the Turnpike Commission's

engineers. The contract was then approved by the Commission's consulting engineers, then by counsel for the Commission, and finally by 14 other people representing the Commonwealth. All of these men, at least at first blush, appear to be as innocent or guilty as Torrance.

It was the theory of the Commonwealth that the defendants had conspired to defraud the Commission by obtaining this contract, and that the drilling and slushing program recommended by Manu-Mine was in fact 95% unnecessary, and that the price for drilling was unconscionably excessive and fraudulent, especially since Manu-Mine had represented that the contract cost per foot of drilling had been computed on the basis of the cost plus only 10 per cent profit.

The Pennsylvania Turnpike Commission was composed on February 28, 1955 of Evans, Chairman, Torrance, McSorley (succeeding Chairman) and Lawler (who shortly therafter became Acting Chairman), and Watson. Manu-Mine Company or its officers and stockholders made a profit from this contract with the Commission variously estimated at from 4 to 10 million dollars. Evans' term expired June 30, 1955. All of the Commissioners (except Watson who was dead) denied that they had committed any fraud, denied any conspiracy or knowledge thereof, and denied any and all wrong-doing. Of the five Commissioners only Evans and Torrance were accused, or arrested, or indicted for conspiracy and fraud.

### Torrance's Appeal

Lawler testified in behalf of the Commonwealth: "Q. Do you mean to tell us that you voted for and did vote for the awarding of the contract and the doing of the work without knowing what was involved? [Lawler had actually visited the scene of the work, and the

Secretary of Highways had had a representative of his department assigned to the work, and 14 different people had approved *each* payment received by Manu-Mine.] A. I depended upon the legal counsel, I depended upon our engineering staff, I depended upon our consulting engineers. That is why the Turnpike has retained these people to advise and instruct us Commissioners." This, as Torrance testified, is exactly the explanation of and the reason why he voted for the contract, as did Lawler, McSorley and Watson. Evans and McSorley were successful business men; the other members of the Commission were experienced in politics and had held public office. No one pretends and no one could successfully contend that McSorley and Lawler and Watson were dupes of Torrance.

Lawler gave as his explanation for his approval of the contract not only a proper and justifiable reason, but the only answer that an honest man could give. Public officials must frequently rely upon their deputies and assistants. These officials cannot be held criminally responsible for the negligence, or even for criminal acts of their deputies and assistants under circumstances such as these. We must never forget that the Commonwealth cannot prove a criminal case by suspicion or conjecture; it must prove it by evidence of facts and circumstances which are of such a nature and quality as to establish the guilt of each defendant beyond a reasonable doubt. *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A. 2d 820; *Commonwealth v. Sauders*, 390 Pa. 379, 134 A. 2d 890; *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A. 2d 861.

The contract was negotiated for the Commission by its engineer Paul. Torrance voted for the contract with Manu-Mine dated February 28, 1955, as did all the other members of the Commission, after it was approved, we repeat, by the Commission's engineers, by the Commission's consulting engineers, by counsel for

the Commission, and by 14 other people representing the Commonwealth. There is absolutely no evidence that any of the Commissioners suggested or dictated any of its terms or even saw the proposed contract prior to the hearing at which it was approved.

What did Torrance do that was wrong or criminal? And what did he do that was different from what Lawler, McSorley and Watson did, who were never accused of wrongdoing or indicted for this crime? The only evidence of any substance whatsoever to convict Torrance was:

(1)    That Manu-Mine Company and/or its officers and stockholders, *with which he had absolutely no connection directly or indirectly,* made a profit of $4 million dollars;

(2)    That "On December 21, 1954 Torrance received from Stickler a Christmas gift certificate * which he used on May 5, 1955 to purchase a suit of clothes." Obviously this was not only unethical, but highly reprehensible. However, it doesn't prove, as the Commonwealth argues, that he was a co-conspirator with Evans, Stickler, Landsidle and others to defraud the Turnpike Commission of millions of dollars;

(3)    That Torrance, who is a farmer, built a trench silo in an old quarry on his farm at a cost of approximately $500. Stickler saw him at the farm show and asked him to permit him to insert on the silo, *which was then already built and ready for use,* a new type of wall which Manu-Mine hoped to market for silos. Torrance, in the light of hindsight, foolishly accepted this offer; and Torrance invited photographers and newspaper men to his farm to see this wall which had been put up by Manu-Mine. Pictures and information about Torrance's silo wall and that Manu-Mine was the builder

---

* One of the engineers who was acquitted received a television set as a Christmas present from Stickler in 1954.

were published in National Farm Journals, newspapers and magazines throughout Pennsylvania.

The theory of the Commonwealth was that it could not possibly have been defrauded of 4 to 10 million dollars unless Evans and Torrance conspired with others to enable Manu-Mine or its officers and stockholders to illegally make a colossal fraudulent profit on this engineering project. If Torrance was a conspirator he was an absolutely indispensable *master* party to the conspiracy. If Torrance was going to enable other persons to make millions of dollars out of this contract, isn't it contrary to reason and all human experience that he would do so for a $200 Christmas present and a *publicly* exposed * unnecessary outer silo wall?  The

---

* What is the distinction, where is the line drawn, between the acts and conduct of public officials and those having a proper legitimate interest in legislation or in matters coming before the public official or public body? What conduct and which acts are proper and which are improper? The Country was startled and shocked by newspaper revelations of large *secret* gifts to public officials during the Truman Administration. The Country was similarly shocked by the revelation of secret loans or gifts to a Presidential Assistant during the Eisenhower Administration. There are revelations every week of open and secret entertainment of National and State public officials, of yachting parties and plane trips, of pleas by Senators and Congressmen for television stations for a friendly constituent in their State, of public and private entertainment and television sets and gifts given to members of the Legislature of Pennsylvania when it adjourns—by persons or companies having business or legislation with or before such public officials or public bodies. With two exceptions not here relevant, none of these men were charged with crime or arrested or indicted for conspiracy or misdemeanor in office or for any crime. Where is the line between what is proper and improper and what is criminal? Isn't it high time, isn't it imperative in order to protect honest public officials and honest men having business with them that a code of ethics be forthwith adopted so that *everyone* may know—without fear of accusations or suspicions—what are his rights and limitations, what is honest and dishonest, proper and improper, legitimate and criminal!

logical inference to be drawn from Torrance's use of the gift certificate is that he was *not* a member of the conspiracy. If he was even suspicious that a scheme or conspiracy existed to defraud the Commonwealth of millions of dollars, would he, in the light of his age and reputation, have joined the conspiracy *as one of its two indispensable master crooks,* or even permitted suspicion to be pointed at him for the sake of a suit of clothes? Isn't the only reasonable inference which can be drawn from his acceptance of the gift certificate, that he knew nothing of the conspiracy or its fraudulent scheme?

It is equally unreasonable and illogical to contend that Torrance's acceptance and publicizing of a new type of wall which Manu-Mine hoped to market for silos prove beyond a reasonable doubt that he conspired to swindle and defraud the Commonwealth of 4 to 10 million dollars, not for himself, but for the sole benefit of Manu-Mine, its officers and stockholders, with which he had no connection directly or indirectly. When a person intends or plans to commit a crime, he goes about it *clandestinely and attempts to hide from the public both his identity and every one of his acts which could be linked to the crime.* Certainly he does not publicize to the world, as Torrance did, his silo wall and that it was built by and can be bought from Manu-Mines. Instead of being evidence in behalf of the Commonwealth to prove Torrance guilty of fraud, it is more reasonable and logical to say that it demonstrates that he was *not* a party to the crime. Yet these were the two rocks on which the Commonwealth built its entire case. This was the evidence which the Commonwealth contends is legally sufficient to sustain the conviction *beyond a reasonable doubt* of a 70 year old man who all his life has had an outstanding reputation for honesty.

In the light of prevailing practices in Harrisburg and Washington, some of which I consider reprehensible, but none of which are considered criminal, and especially in view of the trifling amount of these gifts in comparison with the multi-million dollar profits which Torrance allegedly fraudulently enabled Manu-Mines to obtain, will the law allow the Commonwealth to say that it proved beyond a reasonable doubt that one of the two alleged *master* crooks was guilty of this multi-million dollar fraudulent swindle because he took as his share of the 4 million dollar loot a $200 Christmas gift certificate and a publicly advertised unnecessary wall on his $500 silo? How unrealistic, and with all due deference to others, how ridiculous can we be?

In *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A. 2d 820, the Court said (pages 426, 427): ". . . it is clearly settled that a man may be convicted on circumstantial evidence alone, provided his guilt is proved beyond a reasonable doubt: [citing cases] . . . '. . . The circumstantial evidence in this case [i.e., the facts and circumstances proved in Commonwealth v. Bausewine, 354 Pa. 35, 46 A. 2d 491] is not such "as reasonably and naturally to justify an inference of the guilt of the accused, . . . and of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt": [citing cases].' "

In *Commonwealth v. Bausewine,* supra, this Court, in reversing a conviction for bribery and discharging the defendant, said (pages 40-41): "The testimony adduced by the Commonwealth is weak and inconclusive. . . .

"The burden devolved upon the Commonwealth to overcome the presumption of defendant's innocence and to establish, beyond a reasonable doubt, the fact that he had accepted money to influence him as a police officer to act contrary to known rules of honesty and integrity.

While the mere fact that the evidence adduced is wholly circumstantial is not fatal to the Commonwealth's case (Commonwealth v. DePetro, 350 Pa. 567, 577, 39 A. 2d 838), yet it must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony. The facts and circumstances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, not . . . as being absolutely incompatible with his innocence, but at least beyond a reasonable doubt. The circumstantial evidence in this case is not such 'as reasonably and naturally to justify an inference of the guilt of the accused, . . . and of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt': Commonwealth v. Marino, 142 Pa. Superior Ct. 327, 16 A. 2d 314; Commonwealth v. Libonati, 346 Pa. 504, 508, 31 A. 2d 95; Commonwealth v. Holt, 350 Pa. 375, 387."

In *Commonwealth v. Rogozinski*, 387 Pa. 399, 128 A. 2d 28, the Court said (page 402): " 'The requirement of the law is that in order to warrant a conviction the facts and circumstances proved must be of such character as to . . . [prove] the guilt of the accused beyond any reasonable doubt . . . and that doubt is for the jury unless the evidence "be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances".': Commonwealth v. Libonati, 346 Pa. 504, 508, 31 A. 2d 95."

I agree with three Judges of the Superior Court that the Commonwealth's evidence was legally insufficient to prove Torrance guilty beyond a reasonable doubt of the crime of fraudulent conspiracy of which he was convicted. *I am convinced* that the judgment

against Torrance should be arrested and he should be discharged!

## Evans's Appeal

I turn now to Evans's appeal. The Commonwealth's evidence was more than adequate if believed, as it was by the jury, to convict Evans. However, all the Judges of the Superior Court agreed, and I certainly agree, that a number of trial errors were committed during this trial. The Superior Court, by a vote of 4 to 3, disagreed as to whether the errors were harmless or were so prejudicial as to be reversible errors. I find it necessary to discuss only one of them.*

I believe that realistically and practically an errorless trial would have been impossible, considering the nature and length of this trial, which began June 4 and ended July 25, 1957. The testimony totaled over 5000 pages.

In *Commonwealth v. Fugmann*, 330 Pa. 4, 198 A. 99, Chief Justice MAXEY, speaking for a unanimous Court, said (page 18): "There is seldom any criminal or civil trial of any magnitude or duration into the record of which some irrelevant, incompetent and immaterial testimony does not 'creep' and has been subsequently 'stricken out' and the jury instructed to 'disregard it.'

---

* Some of the questions in these appeals bothered me, as they obviously bothered the Superior Court. President Judge RHODES wrote an exhaustive able opinion of 77 pages. Judge WOODSIDE wrote an able concurring and dissenting opinion, in which he analyzed with more particularity several of the important questions raised by Torrance and Evans. Judge WATKINS likewise wrote an able opinion, especially in connection with the baffling problems of flushing and subsidence in the coal regions, with which he is an experienced expert. Judge WATKINS also devoted a considerable part of his elaborate 31 page opinion to the reasons for the indictment and conviction of Evans and Torrance, which he charged were solely political. I deem it unnecessary to consider these points.

To grant new trials whenever such a thing occurred would mean an interminable and intolerable succession of new trials. There is no standard by which the effect of such formally 'sterilized' testimony on the minds of the jury can be gauged. In theory the law intends that no testimony shall have any but a logical effect on jurors' minds; in practice, nearly all testimony has both a logical and a psychological effect in varying ratios. The law intends that no witness's testimony shall make any appeal except to the jurors' reasoning faculties; in actual practice, a witness's testimony sometimes makes more of an appeal to the emotions than to the reason."

It is, I believe, humanly impossible to set up a test or standard which can demonstrate definitely or with mathematical certainty whether a jury was able to eliminate from its mind and decision, certain incompetent evidence or whether that evidence was of such a nature and character that notwithstanding the instructions or admonitions of the trial Judge, it remained in and influenced and prejudiced their minds. The best definition of a harmless error is that given by Justice (former Chief Justice) HORACE STERN, in *Commonwealth v. Neill*, 362 Pa. 507, 67 A. 2d 276, where, in discussing the effect of an improper suggestion made by the District Attorney to the effect that defendant had attempted to commit an act of sexual perversion, the Court said (page 517): ". . . the question itself, irrespective of its form, was highly reprehensible, because there was nothing whatever in the testimony to indicate that any such offense had been committed or attempted. However, the learned trial Judge, in vigorous language, admonished the jury to expunge from their minds what had thus been intimated, and cautioned them to give no credence to it but to exclude it wholly from their consideration. The test in such cases is *whether the jury may have been so strongly influenced*

by the improper introduction of such an insinuation *that the effect of it on their minds could not likely be dispelled by the court's subsequent instruction to disregard it:* Commonwealth v. Fugmann, 330 Pa. 4, 17-20, 198 A. 99, 106, 107. In the present instance we do not believe that the jury could have been so influenced, for they must immediately have realized that there was no basis for the District Attorney's 'suggestion'. Be this as it may, it is safe to conclude that, in view of the established, even admitted, atrocity of the crime, this incident was not a contributing factor in the determination of the penalty."

The best that any Judge can do is to conscientiously apply this test in each case where the question of harmless or prejudicial and reversible error is raised.

John D. Paul was indicted as one of the conspirators. Paul's testimony before the Grand Jury (which was so lengthy that it covered approximately 300 pages) was admitted in this trial and was read in full to the jury under the theory that it was a confession or a so-called admission against interest and was therefore admissible against him. It was certainly not a confession and it is likewise questionable whether it rose to the height of an admission against interest. Paul was acquitted. The vice of Paul's Grand Jury testimony was two-fold: (1) it contained highly incompetent testimony, hearsay testimony, and his *guesses,* inferences, conjectures and conclusions, and (2) it was *highly prejudicial to Evans.* Paul's testimony was in reality an attempt to incriminate the other defendants, particularly Evans. In order to determine how highly prejudicial to Evans some of Paul's *grossly* incompetent testimony was, I shall quote a few excerpts therefrom:

"Q. Have you given any consideration to the timeliness of August 25th, 1953, and September 1953, in the light of events that have later occurred? A. Frankly, no, as of this minute I had not. Q. Does it seem

to you *as of this minute* that there is any significance to attach to those two periods of time? A. There might have been. Q. *What might have been?* A. It might have been in somebody's mind; certainly not mine. Q. Well, what might have been in anyone's mind that you can think of at this point that *might incite your curiosity?* A. My curiosity now has been developed somewhat by the coincidence, we will call it, of those two dates, insofar as perhaps later activities of Manu-Mine *might have been concerned in somebody's mind.* Q. *What mind are we thinking of* at this moment, sir, that is particularly attractive to your thinking at this moment; what mind would you be attracted to? A. *The only mind* that I would know *that might be at all interested* in Manu-Mine *would be Mr. Evans,* Chairman of the Commission. : . . Q. What would that have possibly entailed if you had given such consideration to those thoughts that would have come through your mind? A. Well, undoubtedly I would have been told that, maybe rather broadly, that it was none of my business, or something like that. Q. In order to convey it to the Grand Jury, we have to do it through what you were thinking. We have to convey it by words, and you have done it very descriptively. Do you think this was a foregone conclusion that Mr. Stickler was going to operate in this field and all you could do was go along with it? A. Well, to what extent Mr. Stickler was received, I think that that was a pretty foregone conclusion that he would get the job, . . . A. . . . and someone besides Mr. Evans, I believe it was Mr. Torrance, and the question was: 'Don't you think we ought to do something about the Department of Mines on this case?' Q. Who made that statement, sir? A. I believe it was Mr. Torrance. . . . Q. What was Mr. Evans' reaction to Mr. Torrance's inquiry? A. 'No, we don't want that.' . . . Q. Mr. Evans did not want the Department of Mines in this matter, did he? A. No. Q.

That was pretty definitely understood by you, was it?
A. *I had that impression.* . . . Q. *Why did you con-clude* that Mr. Evans didn't want the Department of Mines involved in this? A. Well, actually I don't think I examined *his motive* for thinking so at the time. Q. *Have you since that time examined it?* A. Oh, I thought about it a great deal in the past six or eight months. Q. *What has been the conclusion that your thinking has resolved itself into,* sir? A. Simply this: That the Department of Mines presumably has in its possession or in its record a full supply of maps of all mining work; and that information should be available alone. Now, the question of whether to employ Department of Mines personnel, whether that could be done or not, is quite another story, or was in my mind then. Since then it has, of course, been done, and we employed—I mean the Commission paid for their assisting personnel. So that it no doubt would have been just as possible earlier as it was later. Q. Let's give it a little more validity, sir, to the conclusion, I believe. Isn't this a fact: If the Department of Mines had been consulted it would have done just what it has already done and there wouldn't be any Manu-Mine contract? A. I believe that is a fair statement. Q. In other words, Manu-Mine couldn't have gone into a contract that more than $10 million had been paid on if the Department of Mines had been consulted, *isn't that a fair conclusion?* A. *I think so.* Q. So, therefore, Mr. Evans, didn't want the Department of Mines involved in this matter, did he? A. That was clear enough to me. Q. So if the Department of Mines had been involved, Mr. Evans' nephew would not have been involved, is that right? A. I think that is true too. . . . Q. We want to know why, sir. Do you have a reason to ascribe for that? A. The only reason I can ascribe to that is that Mr. Evans might have thought that I would get the contract set up perhaps sooner

than Mr. Stone, or something like that; *maybe he had a special purpose in the back of his mind at the time.* Q. *What could that have been?* A. Well, probably another purpose which could have been in the back of his mind was that I was the man who would, say, be duped, put it that way, or, at least, carry out his order to his satisfaction. Q. In other words, or have you now concluded that Mr. Evans did think that he might more easily have you handle the contract of February 28, 1955, than Mr. Roger Stone? A. I would conclude that, yes, sir. Q. There is a reason, isn't there, sir, for most every bit of human conduct? A. Correct. Q. You have ascribed that as a reason, and you have had an opportunity to reflect on it, have you not, sir? A. Yes, sir. Q. That is your considered opinion this afternoon, isn't it? A. Yes, sir, I think so. . . . Q. Did you conclude at that time that Mr. Evans did not want any other drillers in there because there would have been a competitive bidding on that amount of work which would have contrasted to the $12.50 per foot that Manu-Mine was making? A. *At this juncture I would say yes.* Q. Isn't that the reason why no further drillers were brought into that area? Didn't Mr. Evans make it pretty clear to you if any other driller was brought in there there might be a question concerning the $12.50 per foot? A. I would gather that much very clearly, that if anything like competitive bidding was accomplished that that figure might be reduced. That is my opinion; yes, sir. Q. Therefore, you would conclude from that that Mr. Evans gave the instruction to go ahead and drill, and drill regardless of the cost, isn't that right? A. Yes, sir. . . . Q. Other than that, you felt the influence that Mr. Evans exerted was a primary motive behind this contract for renegotiation? A. Yes, there is no doubt about that. Q. And from decision by Mr. Evans you had no redress? Did he have other Commissioners under his thumb, in your opinion,

as he had the department heads? A. Mr. Evans as I have said dominated the Commission. He got what he wanted and that refers to the other members of the Commission as well, by one method or another. Somehow whatever he wanted to do the Commission agreed to do."

Some of the questions propounded to Paul by the District Attorney were so outrageous that it is astonishing that such an able lawyer would ask a witness for his guesses, inferences, conjectures and conclusions, especially in the light of hindsight. Although the Commonwealth contends otherwise, it is clear and undisputable (see infra) that it placed great reliance upon this testimony of Paul to forge a necessary link in the conviction of Torrance and particularly Evans.

The trial Judge wisely and fairly told the jury that this testimony was admissible only against Paul, and should not be considered against the other defendants.

I have noted the great lengths to which this Court, and particularly the Supreme Court of the United States, goes to protect the basic rights of defendants to a fair trial in accordance with our Constitution, even though the defendants are hardened, dangerous criminals with a long prior record of felony convictions. It seems to me that at least the same concern should be exercised and the same protection should be afforded to men who have up to now enjoyed splendid reputations in this Commonwealth, as is given to hardened criminals. On the basis of these decisions the admission of Paul's Grand Jury testimony—which contains so much that was outrageously incompetent and so much that was highly prejudicial to Evans— constituted incurable reversible error.

Moreover, the difficulty of actually separating it is strikingly apparent from the recent "split-verdict" Act of December 1, 1959, P. L. 1621. Even more importantly, the difficulty of separating and dispelling *these*

*incriminatory terribly damaging guesses and inferences and conclusions against Evans* is aptly expressed and pinpointed by the exceedingly able concurring and dissenting opinion of Judge WOODSIDE: "To emphasize how impossible it was for the jury to follow the Court's instruction not to use this [Paul's] testimony, we need only note that the court itself in its opinion used over 700 words to review Paul's testimony while stating the facts upon which it relied to sustain the conviction of the appellants. Even in the argument before this Court, the District Attorney made extensive use of Paul's Grand Jury testimony to support the conviction of the appellants, particularly Evans. If the judge and the district attorney continue to use Paul's testimony to determine and argue the guilt of the appellants, it is conclusive proof to me that Paul's testimony could not possibly have been ignored by the jury in passing upon the appellants' guilt.

"The evil of the use of this testimony against the appellants is that (1) they had no opportunity to cross-examine their accuser; (2) they had no opportunity to contradict in rebuttal what was said about them; (3) *they had no opportunity to object to and prevent the use of hearsay and other incompetent testimony* given by Paul to the grand jury. *The unfairness of this is so glaring and so basic that it requires the granting of a new trial.* At a new trial, Paul could be called as a Commonwealth witness and could testify to the *facts* contained in his testimony before the grand jury *so far as they are relevant* to the appellants' cases. The defendants would then have the right to cross-examine him and to rebut any untruthful testimony and to have the trial judge limit the testimony to that which is competent. This would give the appellants the fair trial to which they are entitled, and enable the Commonwealth to obtain the conviction of those whom the evidence would show to be guilty."

I wholeheartedly agree with the above statement by Judge WOODSIDE. While it is very unfortunate that a case of this magnitude has to be retried, in my judgment, the safeguarding of the law and the preservation of the Constitutional guarantees of liberty and due process are paramount, and Justice demands that a new trial be granted Evans.

I would therefore reverse the judgment and sentence against Evans and direct, in his case, a new trial.

Paul's references to Stickler and Landsidle were very different in kind and degree from his incriminating and glaringly incompetent references to Evans and constituted, at most, harmless errors. I concur in the Court's opinion with respect to the appeals of Stickler and of Landsidle.

Mr. Justice BENJAMIN R. JONES joins in this Concurring and Dissenting Opinion.