## Commonwealth v. Gravely

*Robert Goldman, Assistant District Attorney,* for Commonwealth.

*Robert Suter, James A. Downey, III,* and *William Fairall, Jr.,* for defendants.

BORTNER, *J.,* May 30, 1980—In a trial by jury before the undersigned, defendants John Gravely, Barbara Johnson and Richard Johnson were jointly tried, convicted on various counts of an information which in each case charged offenses ranging from the possession of a controlled substance through rape, involuntary deviate sexual intercourse, aggravated assault, indecent assault, theft and conspiracies.[1] All three were represented jointly by one attorney (a member of the Public Defender's Office). None testified in his or her own defense. All have filed motions in the nature of motions for a new trial and in arrest of judgment. New separate counsel was appointed for each defendant. We deny these motions for the reasons given in this opinion.

Though (significantly) none have raised questions going to the sufficiency of the evidence upon which they were convicted, we find it useful to a discussion of the questions in fact raised to present

---

1. The information, in fact, charged (in each case) 27 counts: knowing possession of a controlled substance, intentional possession, possession with intent to deliver, delivery, forcible rape, rape by threat of force, forcible involuntary deviate sexual intercourse, intentional deviate sexual intercourse by threat, indecent assault by contact, indecent assault by causing contact, simple assault, aggravated assault, kidnapping, felonious restraint, theft by unlawful taking or disposition, receiving stolen property, criminal conspiracy to commit, possession, delivery, rape, involuntary deviate sexual intercourse, indecent assault, simple assault, aggravated assault, kidnapping, felonious restraint, theft by unlawful taking and receiving stolen property.

a summary of the testimony of the victim in this case, which served substantially if not entirely as the basis for the conviction.

The victim in this case (and principal Commonwealth witness) testified that she was 30 years of age and on October 30, 1977 was living at her mother's house in Warminster; that about 9:30 in the morning her brother (John Gravely) appeared at the house seeking gas money for his car. The witness agreed to give him the money in return for his promise to take her around to look for a place to live (because she could not stay with her mother). She entered a car which she took to be that of Richard Johnson's mother. Driving the car was Richard Johnson. Witness sat in the front passenger seat, her brother behind her in the back seat, and next to him, his wife, Barbara Gravely. Barbara Gravely is Richard Johnson's sister.

At this time in her life, witness was taking a prescribed medicine for her nerves: Valium. When the witness opened her bag to take a pill from a vial (they were prescribed for three times a day), her brother John Gravely took them from her and distributed several around to the others who took about five or six in all. Additionally, the witness was induced by Richard Johnson to take three more herself. Witness remembered that she became high on the Valium and in court had a cloudy memory of the event but she did recall that she was in the car for "hours" and that the parties were "somewhere down in Philly," looking for an apartment ("they wanted all of us to get one together"). The next thing the witness remembered was going to a motel whose name she could not recall because of a cloudy memory for the event. She did recall, however, that she paid the money in advance from (welfare) funds she carried with her in her boot, be-

cause the others didn't have any. She signed in as Mrs. and Mr. Ray Vaughn, her ability to resist overcome by Richard's prior threats that she was his bitch, that she belonged to him and would do what he told her. She testified further that Richard Johnson stood by her when she signed in; that she entered the room with Richard Johnson and was later joined by Barbara and John. Shortly thereafter John or Richard made a telephone call (to get drugs) and Barbara and John left the room to "get drugs."

Thereupon Richard told witness that she "was his bitch" that she "belonged to him" and that she would do "whatever the fuck he told me to do." She became frightened and on his demand, took off her clothes. Richard then pulled her backwards by the hair down to the bed and had intercourse with her, vaginally, rectally and orally. The witness was unwilling, tried to resist, tried to pull away but was held by her hair. .

When Barbara and John returned to the room, Richard told John that he had had sex with the witness and John said it was his guess that Richard had "fucked her good." Barbara and John "fixed up some drugs" and against her will injected the witness with it. John held her arm and Barbara injected the needle into her.[2] Witness tried to move off the toilet but they held her. Furthermore, she was "too scared to do much resisting." Witness believed that she was that day injected two or three times; that after the first injection Richard Johnson continually threatened her that he would break the

---

2. The bottle caps used to "cook" the substance and found in the bag in Barbara's possession contained *heroin*. Thus testified the criminalist witness for the Commonwealth.

witness' neck; that John and Barbara injected her and that after the first injection she was too high to resist. Her vision became blurred, her coordination fell off and she felt funny in the head, sometimes losing her balance.

Witness then recalled that Barbara and John got into a fight; that Richard and John got into a rumble and that John left the motel room.

Witness told Richard she was going to leave and was told by him that she wasn't going anywhere. "Because they thought the cops would come," Barbara and Richard left the motel taking the witness with them.

All three then went to Richard's mother's house (witness testified she was unable to get away from Richard) and then returned to the motel where they were invited to leave (because the room was a wreck). They were later confronted on the road by police officers who had responded to a call from the motel but witness was "too scared" to tell the police what had happened. According to witness, as the police approached, Richard instructed her to "play it cool" or he would break her neck. Witness complied. She was still very high.

They all returned to Richard's mother's house. Barbara went upstairs in the house. Richard and the witness spent the night in the back seat of the car. In the morning a man came out of the house, took the wheel and drove himself and Richard and witness to the man's place of employment. Witness did not say anything to the man about what had happened. Richard retook the wheel and witness got into the front seat and the two drove back to his mother's house. Richard then left witness alone for two minutes while he went into the house to get Barbara. The three went looking for John and found

him at the Salvation Army after which they went to welfare where "John attempted to get a check under an alias." After this, the four went to J.M.Fields "to get more money." The three defendants agreed that Barbara would go in and shoplift, and that thereafter witness would take the things back in for a refund "while John or Richard was behind me watching that I wasn't going to say anything to anybody." This operation was repeated about five or six times. After getting money in this manner, the four went to Mercer Street in Philadelphia where Barbara obtained dope while witness remained with John and Richard. Thereafter the four drove into a side street where the "dope" was prepared for injection and again the witness was unwillingly injected.

The four then drove to the Americana Motel where witness obtained a room (while the three remained on the floor of the car). Then the three "snuck" in the room. Witness testified that she was, even at this time, too scared to tell anyone what she had been through ("because I had been threatened and was petrified the whole time. Every minute, practically, I was threatened to be beaten or to be killed by Richard."). ("The whole time I was with him, you know, after the first motel we were at, it was constantly 'you're my bitch, you belong to me, I own you, do what I tell you to do,' and smacking me in the face and pulling my hair constantly and always threatening to kill me if I didn't do exactly what he told me to do. And I believed him; he was just mean.")

In the room more drugs were taken. The mattress was pulled to the floor where it was occupied by Barbara and John. Witness was on the box spring

with Richard. At this time, Richard really got "mean." He started calling the witness names and pulling her hair again, got her on the bed and had anal intercourse with her. When he finished with this, he proceeded serially to vaginal and oral intercourse, which being unsatisfactory to him, he informed the witness that he had gone to the gas station and "lined up five or six niggers" and that he would collect money for it.

All the previous while, John and Barbara were having intercourse on the floor, John having previously paraded before the witness in the nude, though she was his sister. All the previous while, witness attempted to resist Richard but he had her "by my hair and just kept jamming himself into me." The witness head was pulled down tight by the hair—"besides the weight of his body." Richard penetrated her rectally, vaginally and orally.

Witness testified that she was injected three or four times a day, that she was "scared" and petrified," "high" and "sick." She further testified that the others also injected themselves with similar frequency.

The witness left the motel with Richard to get him beer. They returned with Richard's instruction to witness "to drive as fast as you can past that office because if they see me, I'll break your fucking neck."

Witness left the motel the next morning. Witness "awoke" and told Barbara she was thirsty and was going for a soda. John and Richard were asleep. Witness then went to the manager's office to ask the time. She walked out—returned—then asked for help. She asked to be taken to the hospital but didn't want the police called because "if I turned them in,

they would have me killed and if they couldn't do it, they would have somebody else do it."[3]

The witness then catalogued the indignities she had suffered. Her shoulder length hair was all pulled out of the back of her head; that Richard had pulled it out while compelling her to do what he wanted including a time when she rebelled at going to the J.M.Fields store. She recalled that on one occasion he twisted her arm and smacked her in the face. She recalled being struck by Richard "many times, every day." The hypodermic needle was kept in Barbara's purse.

Each brief of defendants assigns, inter alia, as error the ineffectiveness of counsel. This is seen by them as consisting of the existence of a conflict of interest by trial counsel's joint representation of all three defendants; his failure to file a conflict petition prior to trial; his failure to move for a severance; his failure to request and secure a multi-representation colloquy on the record; and his failure to explain to each defendant the implications of common versus separate representation of all three defendants or to "permit them to testify."

Of course, it is well settled that by virtue of the Sixth Amendment a person accused of a crime has the right to be represented by counsel at trial: Gi-

---

3. The resident motel manager described her appearance and her outcry. "She was a 'nervous wreck; hysterical, crying.' She was a mess . . . her hair was messy and was short in the back of the head—'just looked like it was cut or something.' She had her sleeves rolled up and she was still shaking, she had track marks, fresh track marks—'they were red, they were fresh—the skin was still lumped up—on both arms.'

"She told me that three people . . . her sister-in-law, brother-in-law and brother had raped her, that they forced her to go with them and they stole her money and jewelry and . . . stole her clothes and she didn't have anything . . . that they shot her up and they took medicine away from her."

deon v Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963). An essential element of this right is the right to the "effective assistance of counsel." Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); Com. v. Breaker, 456 Pa. 341, 318 A. 2d 354 (1974); Com. ex rel. Washington v. Maroney, 427 Pa. 599, 235 A. 2d 349 (1967). "Inherent in the right to effective assistance of counsel is the correlative right to be represented by counsel unburdened by any conflict of interest." Com. v. Breaker, supra, at 343, 318 A. 2d at 355, citing Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Com. ex rel. Whitling v. Russell, 406 Pa. 45, 176 A. 2d 641 (1962).

However, it is equally well established that dual representation, in and of itself, does not amount to a conflict of interest: Com. v. Sullivan, 472 Pa. 129, 371 A. 2d 468 (1977); Com. v. Breaker, supra, at 351; Com. v. Cox, 441 Pa. 64, 270 A. 2d 207 (1970). To succeed on this ground an accused must prove both (1) that there was a dual representation, and (2) that as a result, a conflict of interest actually existed: Com. v. Sullivan, supra, at 161; Com. v. Breaker, supra, at 345. Furthermore, "[t]o make the dual representation rise to a true conflict, appellant need not show that actual harm resulted . . . but he must at least show the possibility of harm. . . ." Com. v. Wilson, 429 Pa. 458, 463, 240 A. 2d 498, 501 (1968). See also Com. v. Breaker, supra, at 345. An accused can demonstrate possible harm by showing that the defense advanced by appellant at trial was inconsistent with that of his co-defendant or by showing that counsel neglected appellant's case and instead concentrated on the co-defendant's case: Com. v. Breaker, supra at 345; Com. v. Cox, supra at 69; Com. v. Wilson, supra, at 463.

In Pennsylvania the courts have followed this

principle and have added guidelines for determining when a conflict of interest has arisen sufficient to vitiate the proceedings. In order to receive a new trial based upon a conflict of interest, appellants must show that a conflict of interest *arose and actually existed* during the trial and that the conflict was of a type which created a potential of harm with regard to the accused's defense: Com. v. Breaker, supra, at 344, 345. Of course, if the accused can show that he had a defense inconsistent with that advanced by his co-defendant, or that counsel neglected his case to give a more spirited defense to a co-defendant, he satisfies the aforementioned criteria: Id. See also Com. v. Cox, supra. On the other hand, courts have generally found that no conflict of interest exists where co-defendants receiving joint representation present a joint defense, as by denying culpability and blaming other persons for the crimes: Com. v. Small, 434 Pa. 497, 254 A. 2d 509 (1969); Com. v. Resinger, 432 Pa. 398, 248 A. 2d 55 (1968); Anno., Conflict of Interest Between Co-defendants Precluding Representation by Same Counsel, 34 A.L.R. 3d 470 (1970).

We have assiduously searched the briefs of counsel for their *evidence* and *identification* of the precise moment or event in the trial where the conflict of interest *arose and actually existed.*

We have found none.

One counsel argues that:

(1) "Inconsistent" defenses for each of defendants "had" to exist because (a) two defendants are males, one a female; (b) each is charged with 27 charges, 16 substantive and 11 inchoate (conspiracy); and (c) the charges include rape, possession of a controlled substance and delivery in an incident

alleged to have taken place "over a lengthy period of time."

Another counsel argues that (but does not demonstrate how):

(2) An examination of the charges against defendants can result in no other conclusion but that these defendants had such varying interests that there was no basis for going to trial with one attorney representing all three.

Third counsel argues that:

(3) The fact that the jury distinguished between the three defendants' culpability[4] (in the different verdicts against them) *"is evidence that there were inconsistent defenses."* Thus the argument emerges that in a case involving a large number of offenses (including rape), involving multiple defendants (including a female), the fact that a jury discriminates between them as to their culpability in respect of the various offenses charged is itself *evidence* that the defenses were "inconsistent."

What it fails to take into account, in this case, is that the very same *evidence* which convicted one defendant (Richard) clearly exculpated the other

---

4. Barbara was acquitted of rape by threat of forcible compulsion, involuntary deviate sexual intercourse, involuntary deviate sexual intercourse by threat of forcible compulsion, indecent assault, kidnapping, theft by unlawful taking, receiving stolen property and the correlative conspiracies.

John Gravely was acquitted of involuntary deviate sexual intercourse, involuntary deviate sexual intercourse by threat of forcible compulsion, indecent assault, kidnapping, theft by unlawful taking, receiving stolen property and the correlative conspiracies.

Richard Johnson was acquitted of kidnapping, theft, receiving stolen property and conspiracy to commit involuntary deviate sexual intercourse, indecent assault, kidnapping, theft and receiving stolen property.

two (Barbara and John). There was no way that Richard could have taken the stand to accuse Barbara of having raped the witness and Barbara did not need to take the stand to testify that it was Richard who raped the witness, for the witness had already done that. If there had been ambiguity in the testimony as to who did what, this may have provided fertile soil on which to grow a defense of inconsistency. But the evidence was clear as to who was on first and what was on second (to borrow a somewhat homely analogy from Abbott and Costello).

Review of the evidence makes clear that there were no inconsistent defenses in the case. No defendant in this case was required to testify against another because the victim in the case had already testified against all, assigning different roles to different defendants. No particular defendant needed to take the stand in self-exculpation on the basis of nonparticipation. Those who might usefully take the stand *already had been given the benefit of that exculpation by the victim herself* (hence the different verdicts). Since the victim had so clearly given evidence of the crimes and the identity of the participants, some in one, some in another, there was only one kind of useful evidence that each defendant could give in common with the other defendants. Each could have mounted the witness stand and either (a) categorically denied that any of it happened, or (b) asserted that all of the activity was consensual (in which case they convict themselves of the drug offenses).

Which leads us to the question of why they did not testify.

Of course, we do not recognize the claim found (for the first time in this case) in one brief that

counsel did not *permit* his clients to testify. There is no record of this. No defendant in this case, ever, on this record complained of such a deprivation. And we will not recognize any argument based on this naked assertion dehors the record.

We will, however, address the ineffectiveness claim in terms of whether we may perceive a good tactical and strategic reason for the decision taken by defendants to accept the advice of their counsel not to testify.

"Realizing as we do the possibility for harm arising from dual representation, we think that a proper application of Washington to any alleged conflict of interest requires a showing that counsel's actions on behalf of his now complaining client would have been sufficient under Washington even had there been no dual representation." Com. v. Wilson, supra, at 464.

Thus we must ask ourselves, assuming that counsel had represented only one (any one) of defendants and had advised her or him not to testify, would this advice have had some reasonable basis designed to effectuate that defendant's interest? Applying this test to the facts of this case, we are compelled to the conclusion that defendants and their counsel were faced with a dilemma and an excellent way out.

A decision taken by *any* of the three defendants to testify was in general subject to several kinds of jeopardy: (1) cross-examination which may have shaken his or her credibility; (2) possible impeachment by the introduction of a criminal record. A decision to take the stand and *deny* that anything the victim testified to was true subjected any one of the testifying defendants to the possibility that the *denial* be undercut by the above. A decision to take

the stand and *assert* that the events described by the victim did in fact happen *but were consensual* subjected that testifying defendant to possible conviction on all the drug offenses and possibly one sex offense.

But defendants were not stuck on the horns of this dilemma. There was a useful stratagem that could be employed without risk of testifying. It is quite obvious from the nature of defense counsel's cross-examination that the decision taken was the decision to *destroy by cross-examination* the Commonwealth's case by an effective and withering attack on the credibility of the victim. This carried *no risks* and contained the potential for complete acquittal on a jury's decision that the *victim's story was an inherently unbelievable fantasy.*[5]

---

5. The jury quite evidently did believe her. I would not have been shocked had they acquitted. Defense counsel lost not one single opportunity to point out those matters to which *she* testified which another jury may have found "hard to swallow." The cross-examination suggested if it did not establish that the victim was a drug abuser, it established that she had opportunity to cry out at the registration desk in the first motel; that she complained of no abuse or compulsion which was prior to the registration; it suggested if it did not establish that she had consensual intercourse with Richard Johnson after John and Barbara returned to the motel with drugs; it established that she was familiar with drugs because she knew what a "cooker" was and understood the meaning of "set of works," "Joneses," "cold turkey"; it established that she had the opportunity to escape when the two hotel managers came down to investigate the situation (though she had just painfully been raped); it established that in fact *she argued* with the manager that it was unfair to be kicked out; it established that she again had the opportunity to cry out to the police when the officers stopped the group on Route 611; it established that she made no effort to escape from the car the night the three of them went to Richard Johnson's mother's house; it suggested that she remained in the car all night with Richard not because he had his

We think it clear from our discussion that if counsel had represented only one (any one) of these defendants, the decision taken by him not to encourage his client to take the stand would have stood on an undeniably reasonable basis designed to effectuate that defendant's interest *in this case*: Com. ex rel. Washington v. Maroney, 427 Pa. 599, 235 A. 2d 349 (1967). Contrary to the contention pressed by

---

arms and legs around her, but because Johnson's mother refused her entrance to the house because she was a "baby snatcher" and a "drunkard"; it established that she had the opportunity to cry out to the "man" in the morning when he employed the car to go to work; it established that when the man arrived at his destination, Richard got behind the wheel and the victim joined him in the front seat; it established that the victim entered J.M.Fields department store four or five times to engage in a crime but never used the opportunity to cry out for help, it established that her actions were sufficiently cool to prevent suspicion from being aroused; it established that it was the *victim* who signed in at the Americana and paid the rent; finally, there was at least the small suggestion that the bag taken from Barbara (containing the "works") was actually the property of the victim.

Much of this is corroborated: the desk clerks at the Willow Grove Motel testified that there was nothing out of order as to victim's physical appearance; she had no difficulty walking; there seemed to be no problem with her writing; she had no difficulty making verbal responses and it was she who paid for the room; later, when the desk clerk asked defendants and victim to leave, *she* was the most vociferous in her objections to being put out, made no complaint of abuse, did not appear to be in fear of anyone and spent ten minutes *alone* with the desk clerk in the room looking for her brassiere while Richard Johnson was outside waiting in the car. The police officer who stopped them subsequent to this received no complaints of assault and saw nothing unusual about the victim. The doctor who examined her and the hospital saw no external indicia of rape and the criminalist found no seminal fluid or spermatozoa on the slides taken by the physician at the hospital and found no hairs on the victim's pubis which were not hers.

one of the appeal counsel that the decision not to testify was a function of trial counsel's inability to favor or represent the interest of one over the other because defendants' interests were so varied, we view this decision in the light of our analysis to have been taken, not out of paralysis, but affirmatively and precisely because defendants' interests (strategically and tactically) *were the same,* i.e., to make the victim out a liar.

In the light of our analysis we would correlatively find no ineffectiveness in trial counsel's omission to file a conflict petition.

The severance argument does not much appeal to me. The Commonwealth's theory at the outset was that this was a joint criminal venture embracing as to all defendants a common set of facts. In the exercise of my given discretion I would have undoubtedly denied a motion for a severance at the outset. I am now convinced, in the light of the record, that counsel would have been hard pressed to convince me that the guilt of one defendant would have "spilled over" on to the other less culpable defendants. The jury's discriminating verdict demonstrates that such a fear would have been just that and no more. It therefore does not strike me odd that trial counsel did not ask for a severance.

There was no ineffectiveness in trial counsel's failure to request or in my failure to offer a multi-representation colloquy on the record. The absence of such a colloquy does not, per se, entitle defendants to a new trial.[6] Com. v. Bracero, 262 Pa. Superior Ct. 189, 396 A. 2d 709 (1978).

6. See footnote 6 at 196, 396 A. 2d at 712, Bracero, supra. The Superior Court of Pennsylvania suggests we follow the position of the Second Circuit Court of Appeals: Trial court's duty is not automatic but is triggered when a potential conflict

All appeal defense counsel have taken us to task for refusing an offer of proof to be made by two witnesses: Charles Brown and Dr. Furman. Defendants offered this doctor to prove that he treated the victim beginning October 20, 1977 for "bad nerves" and dermatitis connected therewith and that he prescribed 5 mg. Valium; that he saw her on October 24 and she was crying, upset and depressed and he referred her to Warminster General Hospital Psychiatric Unit (she didn't go); that she came into his office on October 28 and she at that time was suffering from *severe anxiety neurosis* for which she was given Librium or Valium; that after the event, the doctor prescribed 42 tabs of Librium on November 26; and that on December 12 he responded to a call from a private residence that she had swallowed 42 Libriums.

We asked counsel at sidebar if he were claiming that the testimony of the victim was the product of prevarication and fabrication and whether the doctor would testify that her emotional condition was that it rendered her incapable of telling the truth. The answer was, "Well to tell you she is a very anxious and distraught woman."

The court expressed its belief that people can be anxious before and after a rape (especially after). Counsel's rejoinder was that he thought the victim's emotional condition before the rape went to the question of her credibility. "That is my offer," said counsel. "I cannot represent to the court that he will testify to any more than what I have presented. She is not just an anxious person, she

arises. When conflict becomes *apparent,* the trial judge should suspend trial and conduct a hearing to determine whether a conflict has arisen and advise defendants of their rights to independent counsel.

thought she had a pregnancy when she originally came in—she had no pregnancy."

The manual *offered to the court by counsel* (American Psychiatric Institute) had this to say about Anxiety Neurosis: "Traditionally, neurotic patients, however severely handicapped by their symptoms are not classified as psychotic because they are aware that their mental functioning is disturbed. Anxiety is *a chief characteristic of Neurosis. The neurosis as contrasted to the psychosis manifests neither gross distortion or misinterpretation of external reality nor gross personality disorganization.*"

Additionally the physician was a general practitioner and not a board certified psychiatrist. There was, therefore, a serious question of qualifications. This aside, the offer of proof failed because it could not *bear relevantly* on the question of whether the victim could be believed. The quoted psychiatric material above would appear to indicate that neurotic women in the opinion of physicians are not rendered thereby incapable of telling the truth. Nor is there a principle of law known to my research which requires neurotic women to be disbelieved because they are neurotic.[7]

---

7. The case of Com. v. Chuck, 227 Pa. Superior Ct. 612, 323 A. 2d 123 (1974), is inapposite. There, the witness had been institutionalized in a mental hospital for a period of three months pursuant to the provisions of the Mental Health and Retardation Act. He was discharged some seven months prior to the trial in which he was the Commonwealth's principal witness. Treatment in a mental hospital within seven months is "near enough to raise a question for the jury as to the effect of the mental disorder on his *credibility*" even if it did not necessarily thereby render him incompetent to testify. We do not view suffering anxiety neurosis as the equivalent of an institutionalization in a mental hospital.

Charles Brown is another matter. The transcript will reveal that the victim on cross-examination denied using heroin, barbituates or any other drugs for a period of two years prior to October 30, 1977; failed to recall that she had seen Charles Brown in January of 1977; and denied familiarity with different kinds of drugs and what they do to your head. At trial I ruled that questions on cross-examination relating to the victim's drug use within five years were relevant to the question of whether her testimony that she was involuntarily drugged was true.[8]

Counsel offered Charles Brown to prove that during the month of September, 1977 he, in the company of his wife or girlfriend, had the occasion to "shoot" narcotic drugs with victim. The testimony would further establish that the drugtaking on victim's part was voluntary and that at that time her arms were observed to contain "tracks." We were at first inclined to allow this witness to testify in impeachment of the victim's testimony (that she did not in the past abuse controlled substances) but after a moment's reflection we refused the offer for this reason: The law of symmetry would appear to call for impeachment of victim Betty J. by Charles Brown. But the law of evidence does not allow it.

---

8. An exception to the long list of potential avenues of cross-examination which are prohibited by operation of the rules of relevancy is cross-examination for the purpose of evaluating the credibility of the witness and the evidence supplied by the witness' direct testimony. The test of relevancy for this purpose is not necessarily whether the response sought from the witness will shed light on a material issue, but whether the answer will assist the trier of fact in evaluating his credibility and in assessing the probative value of the witness' direct testimony: Brown v. U.S., 409 A. 2d 1093 (D.C. Court of Appeals 1979).

Closer examination of the problem reveals that the impeachment is really on a *collateral matter.* Worse still, it is in this case an attempt to do with the victim's prior use of drugs what the rape statute will not permit the defense to do with respect to the victim's prior sexual activities (except with defendant).

Our view of it is that in a prosecution alleging forcible drugging of another, evidence of specific instances of the alleged victim's past drug behavior should no more be admissible than evidence of specific instances of the alleged victim's past sexual conduct is now admissible in a rape case.[9] In effect the statute has made prior sexual activity a collateral matter. Our holding, in the spirit of the statute, is that the victim's prior drug activity (except with defendants) was collateral.

I recognize that a party may present evidence to contradict testimony elicited by his own cross-examination of a witness: Com. v. Hickman, 453 Pa. 427, 432, 309 A. 2d 564, 567 (1973). However, this presupposes the propriety of the cross-examination. If a witness is improperly cross-examined concerning a collateral matter, the examiner is bound by the witness' answers and may not contradict them: Hester v. Com., 85 Pa. 139 (1877); Hildeburn v. Curran, 65 Pa. 59 (1870); 2 Henry, Pa. Evid, §802. This rule is applicable to cross-examination designed as in the instant case to affect the credibility of the victim: Com. v. Graham, 170 Pa. Superior Ct. 343, 347, 85 A. 2d 632 (1952).

The test of whether a matter inquired into on cross-examination is collateral is whether the examining party could prove the matter as part of his

9.  18 Pa.C.S.A. §3104.

own case: Com. v. Fisher, 447 Pa. 405, 413, 290 A. 2d 262, 267 (1972); Com. v. Zervas, 302 Pa. 510, 514, 153 Atl. 767, 768 (1931); Farms Appeal, 216 Pa. Superior Ct. 445, 451, 268 A. 2d 170, 174 (1970). In short, there must be a basis for admissibility "independent of the contradiction." Com. v. Evans, 190 Pa. Superior Ct. 179, 251, 154 A. 2d 57 (1959), affirmed on the opinion below, 399 Pa. 387, 160 A. 2d 407 (1960), cert. denied, 364 U.S. 899, 81 S.Ct. 233, 5 L.Ed. 2d 194 (1960); Com. v. Williamson, 243 Pa. Superior Ct. 139, 364 A. 2d 488 (1976) (Spaeth, J., concurring, pp. 146-149).

Having no independent basis for admission other than contradiction, Charles Brown's testimony, *because collateral,* was properly refused.

We have also been taken to task for submitting a "verdict slip" to the jury.

In this case which took several days to try and in which there was voluminous testimony regarding the various charges,[10] I felt it necessary to reduce to a simple and innocuous writing the barest list of the charges, believing as I do that holding 27 counts (as to three defendants) in one's head while deliberating is more than one could reasonably expect from jurors of average and reasonable intelligence. I did this to prevent what I perceived to be the potential confusion which might follow from the jury's efforts to distinguish the various counts to say little of the various defendants' relation to those counts. I did not address interrogatories to the jury as in Baker,[11] nor did I summarize even to miniscule extent, the operative facts which the Commonwealth contended was proof of the wrongdoing. I am convinced that the *discriminating* verdicts of the jury

10. See footnote 1, supra.

11. Com. v. Baker, 466 Pa. 382, 353 A. 2d 406 (1976). Even here, there was no abuse of discretion.

owed their *success* to the availability of the verdict slip.

It has already been held that Pa.R.Crim.P. 1114 is not controlling on the issue raised by the submission of a verdict slip to a jury since the slip is neither in the prohibited class of items under Rule 1114, i.e., a written confession, transcript of trial testimony, or an indictment or information, nor in the permitted class of exhibits, i.e., an "exhibit." Com. v. Kelly, infra. The generally accepted rationale for limiting the written material which can go out with the jury is to make certain that the jury does not give undue weight to the written materials at the expense of other evidence produced at trial which is not in written form: Com. v. Kelly, 245 Pa. Superior Ct. 351, 369 A. 2d 438 (1976).

While I have no quarrel with this view, I cannot agree with appellants' argument that the slip so "resembled an information" as to violate Kelly. All that is needed to support my view is an examination of the slip itself.

In my view "[a]lthough a strict reading of Rule 1114 might prohibit sending out a verdict slip with the jury, we do not believe that was the intention of the rule and we have analyzed the effect of submitting this slip to the jury in light of protecting the same interests which Rule 1114 specifically seeks to protect." Com. v. Kelly, supra, at 368. In this I believe I have succeeded.[12]

---

12. Note must be taken of the fact that I, in my charge, specifically cautioned the jury not to accept the slip from me as an indication that defendants must be found guilty of at least some of the charges considering their large number. They were reminded that the function of the slip was provided for convenience and ease of deliberation, that each charge stood on its own feet and that whether defendants were guilty of all, some or *none* was for the jury to decide.

Finally, complaint is made of improper judicial intervention in the trial. We have examined the transcript and find only that we on occasion questioned witnesses in order to clarify the testimony and issues raised by objections. I perceived no "slant" to the questions (if anything, they could arguably be said to favor the *defense*). Considering the length of the transcript, our questions appear not only few but lacking in prejudice to the defendants. Our right to question witnesses has long ago been established. In a proper case, it may even be our duty. See cases cited in footnote 5 in Com. v. Seigrist, 253 Pa. Superior Ct. 411, 418, 385 A. 2d 405 (1978).

## ORDER

And now, May 30, 1980, the motions for new trial and in arrest of judgment of defendants John Joseph Gravely, Barbara Ann Johnson and Richard Patrick Johnson are denied. Pre-sentence investigations shall be made by the Bucks County Adult Probation Department. Defendants shall thereafter appear for sentencing at such time and place as designated by the district attorney.